Opinion by Judge REINHARDT; Dissent by Judge MURGUIA.
OPINION
REINHARDT, Circuit Judge:
This case involves a penalty enhancement statute, 18 U.S.C. § 844(h)(1), which imposes a mandatory ten-year consecutive sentence (in addition to the sentence for the underlying felony) on anyone who “uses fire ... to commit any felony.” The enhancement is increased to twenty mandatory consecutive years for a second offense.[1] § .844(h). Defendants Clinton Thompson, Tavrion Dawson, and Samuel Eaton were convicted of bank larceny, and their sentences were enhanced because they were convicted of using a thermal lance—a tool designed to cut through metal using extreme heat. The defendants used the tool to cut open the back of an ATM in order to steal the money it contained. We must now decide whether the penalty enhancement for “us[ing] fire” to commit a felony under 18 U.S.C. § 844(h)(1) is applicable to the use of a thermal lance tool. We conclude that it is not. As a result, we reverse defendants’ convictions under § 844(h)(1) and the corresponding conspiracy counts under § 844(m); we vacate the sentences on the remaining counts of bank larceny; and we remand to the district court for resentene- *1013 ing on the remaining counts of bank larceny.[2]
FACTS
Samuel Eaton masterminded a plan to rob the Los Angeles Federal Credit Union ATM in El Monte, California, using a thermal lance to cut open the back of the ATM. He enlisted the help of Christopher Williams,[3] Clinton Thompson, III, and Tavrion Dawson. On the evening of January 28, 2008,[4] Eaton dropped Williams off at the Los Angeles Federal Credit Union, where Williams broke into the ATM room through an adjacent abandoned store, using a crowbar to smash a hole through the drywall. Once inside, he triggered the alarm and disabled the camera. Williams then met Eaton at his car, where they waited to see if the police would respond. The bank manager and police arrived at the scene, but, seeing no signs, of criminal activity from the outside, they left. Eaton and Williams then met Thompson and Dawson at a nearby Denny’s Restaurant to hand off the tools—Thompson brought the thermal lance and Dawson brought a hammer.[5]
After several hours had passed, Eaton and Williams went back to the Los Ange-les Federal Credit Union and reentered the ATM room with the thermal lance. Eaton and Williams assembled the thermal lance and Eaton operated it to cut open the ATM by melting through the metal vault. At the same time, Williams sprayed water from a five-gallon .water canister into the ATM to prevent the money inside from catching fire. • Once the ATM was open, the two men gathered the money into a black duffel bag and left the bank. They stole approximately $79,000.
The tool that Eaton and Williams used to cut open the ATM—a thermal lance—is a cutting tool designed to cut, pierce, and • gouge metal. The component parts are a “pistol grip” (similar to the nozzle on a garden hose), a “cutting rod,” an oxygen tank, a battery, and a striker plate. The pistol grip operates the thermal lance tool by regulating the flow of pressurized oxygen from the tank through the cutting rod, .which is a hollow steel alloy pipe containing several wire rods of magnesium or aluminum metal. One end of the pistol grip connects to the cutting rod. The other end of the pistol grip connects to the oxygen tank and, separately, to one side of a 12-volt battery, similar to a car battery. The other side of the battery connects'to a metal striker plate.
Once everything is assembled, the operator “lightly squeeze[s] the oxygen control lever” on the pistol grip to start the flow of oxygen and “slowly pull[s] the rod across *1014 the striker plate” to create a spark. This spark ignites the oxygen, causing the tip of the cutting rod to change state from a solid to a liquid form, and in the process the lance can be used to cut various metals by touching the cutting rod to the metal surface. The thermal lance emits other sparks, or a “flickering flame” as it operates. It cuts the metal by melting through it with the extreme heat—up to 10,000 degrees Fahrenheit—created at the tip of the lance. To stop cutting, the operator need only release the oxygen lever of the pistol grip, ceasing the flow of pressurized oxygen. Releasing the pistol grip also stops the sparks or “flickering flame.”
The most common uses of the tool, as established by the instructional video shown to the jury, are on construction sites to cut or pierce metal. Notably, the thermal lance can be used to cut metal underwater. Although it emits a byproduct of sparks and a “flickering flame” as it operates, the extreme heat expelled by the pressurized oxygen actually cuts through the metal. The sparks and “flickering flame” are only incidental to the purpose of the tool, which is to melt through metal using extreme heat. The risk of fire that accompanies the use of the thermal lance is that the sparks or “flickering flame” given off by the extreme heat generated at the tip of the cutting rod may accidentally catch something nearby on fire. As the manual notes: “[sjparks, splatter and molten material generated by [using the thermal lance] can cause fire.”
Eaton and Williams took steps that successfully avoided any risk of a fire. Williams continuously sprayed the ATM with water from a five-gallon water canister while Eaton was operating the thermal lance. Their use of the thermal lance, nonetheless, left traces of the extreme heat used. The photographs and testimony revealed a few burned bills from the ATM, “tile on the ground [that] was burned,” “walls [that] were a little bit shaded” with soot, and a smell of smoke in the room, described by one investigating officer as an “industrial burning type smell, like plastic, or steel.”
The efforts Eaton and Williams took to avoid fire were also apparent from the evidence. The testimony and photos revealed that the floor surrounding the ATM vault was covered in water. Detective Black testified that there were “water rings that were still moist on the floor immediately next to the safe.” Eaton concentrated his use of the thermal lance on the ATM vault, and, as a result, it did not cause any structural damage to the buildings. No fire alarms went off, and the fire department was never called.
PROCEDURAL BACKGROUND
This appeal involves three defendants: Thompson, Dawson, and Eaton. Thompson and Dawson were charged and tried jointly for their involvement as aiders and abettors as well as conspirators in the events surrounding the bank larceny at the Los Angeles Federal Credit Union on January 28, 2008. Eaton was tried separately. He faced additional counts for committing a bank larceny at the Bank of America on February 5, 2008. Before trial, each of the defendants sought to have the “uses fire” charges dismissed because, they argued, as a matter of statutory interpretation, § 844(h)(1) does not apply to the use of a thermal lance tool. The district court denied the motions, explaining that the statutory language is “clear and unambiguous.” Defendants renewed their motions to dismiss as motions for acquittal, which the district court again denied. After jury trials, defendants were convicted on all counts. At sentencing, the court applied the “uses fire” penalty enhancement, 18 U.S.C. § 844(h)(1), to the defendants’ sen- *1015 fences. Defendants timely appeal. We have jurisdiction under 28 U.S.C. § 1291.
DISCUSSION
This appeal raises a question of statutory interpretation that we review de novo.[6] United States v. Youssef, 547 F.3d 1090, 1093 (9th Cir.2008) (citation omitted). We must interpret the penalty enhancement under § 844(h)(1) and determine whether the statutory language “uses fire” includes defendants’ use of the thermal lance tool.[7]
Because “uses fire” is not otherwise defined in the statute, we first ask whether the “ordinary, contemporary, [and] common meaning” of the language answers the question before us—that is, whether it includes defendants’ use of a thermal lance. See United States v. Macielr-Alcala, 612 F.3d 1092, 1096 (9th Cir. 2010). If the language is ambiguous or is capable of more than one reasonable interpretation, we “consult the legislative history, to the extent that it is of value, to aid in our interpretation.” Merkel v. Comm’r of Internal Revenue, 192 F.3d 844, 848 (9th Cir.1999). The statute’s “purpose” also guides our analysis. See Jonah R. v. Carmona, 446 F.3d 1000, 1005, 1010-11 (9th Cir.2006). These canons of construction “are not mandatory rules” but rather guides “designed to help judges determine the Legislature’s intent as embodied in particular statutory language,” and “other circumstances evidencing congressional intent can overcome their force.” Chickasaw Nation v. United States, 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001). The Second Circuit has interpreted a closely associated word in the same statute, and we reach the same result applying a similar analysis. United States v. Graham, 691 F.3d 153, 156 (2d Cir.2012), vacated on other grounds, — U.S.-, 133 S.Ct. 2851, 186 L.Ed.2d 902 (2013).
I.
The “ordinary, contemporary, [and] common meaning” of “uses fire” does not include using a tool like the thermal lance because we ordinarily understand “fire” to refer to flames that burn in a sustained manner. Maciel-Alcala, 612 F.3d at 1096.
First, the common. meaning of “uses fire” does not include burning by heat. It *1016 is common sense that heat can cause burning-type damage, without any actual fire being involved. For example, a hot iron left on a shirt for too long will leave the shirt badly burned. That the up to 10,000 degrees Fahrenheit heat generated by the thermal lance tool results in burning-type damage does not suggest that fire, rather than extreme heat, caused this damage.[8] The thermal lance instructional manual makes clear that the thermal lance uses heat and not fire to cut through the metal,[9] The manual makes no mention of fire, except to warn of the risk that fire may result from the “[s]parks, splatter and molten material generated by [the] process” of using the thermal lance.
Second, although a byproduct of operating the thermal lance is that the tool emits “sparks,” or a “flickering flame,” neither constitutes “fire” in the common meaning of the word. The sparks are merely particles of the melting metal given off by the thermal lance. At Eaton’s trial, Detective Black described these sparks as a “flickering flame.” Whatever the label, our ordinary understanding of “fire” is that it involves sustained burning of flames, not just particle-like sparks, given off by the tool, or a “flickering flame” that is not sustained burning and ceases whenever the operator of the tool releases the pistol grip or other mechanism.
Third, even if sparks or a “flickering flame” did constitute “fire,” they were not “use[d] ... to commit a[ ] felony,” but rather were merely incidental to the use of the thermal lance. § 844(h)(1). To “use” means to “actively employ.” See Bailey v. United States, 516 U.S. 137, 143, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (defining “use” as “active employment”), superseded by statute, Act of Nov. 13, 1998, Pub.L. No. 105-386, 112 Stat. 3469. Operation of a thermal lance actively employs, or uses, extreme heat and pressurized oxygen to penetrate metal. The metal being cut never catches fire. The sparks and “flickering flame” are merely a byproduct of the operation of the tool. The tool’s function is to use extreme heat—not fire—to cut through metal. Moreover, even if a “mini-fire” could be said to result from the sparks or “flickering flame,” this does not serve the purpose of using the tool because it does not aid in cutting the metal in any fashion. Quite the contrary, the successful use of a thermal lance involves careful avoidance of the risk of fire. For example, here, defendants assiduously avoided starting a fire by spraying the ATM with water the entire time that they operated the thermal lance tool.
Thus, we conclude that use of a thermal lance tool—designed to cut through metal using extreme heat, not fire—does not fall within the “ordinary, contemporary, [and] common meaning” of “uses fire.” Maciel-Alcala, 612 F.3d at 1096; § 844(h)(1).
II.
The dissent reaches a different conclusion by adopting the government’s definition of “fire” as the “chemical process of combustion involving heat, light and a combination of smoke and flame.” According to the dissent, because a chemical combustion occurs at the tip of the thermal lance that involves heat, light, and a combination of smoke and a “flickering flame,” the defendant uses “fire” within the mean *1017 ing of § 844(h)(1). Not only does the dissent’s definition- of “fire” fail to comport with the ordinary meaning of that term but the dissent fails to comprehend that, as explained earlier, the defendant “uses” not fire, but a thermal lance, to commit the felony in question. Moreover, the dissent’s approach to the statutory interpretation of § 844(h)(1) was squarely rejected by the Second Circuit in United States v. Graham, 691 F.3d 153 (2d Cir.2012).[10]
In Graham, the Second Circuit resolved a similar dispute over a similar term in the same sentence of § 844(h)(1). Graham was convicted for “us[ing] fire or an explosive to commit any felony” because he shot a gun at the ground to commit extortion. Graham, 69Í F.3d at 155. • On appeal, Graham argued that, as a matter of statutory interpretation) Congress did not intend “uses ... an explosive” within the meaning of § 844(h)(1) to apply to shooting a gun. Id. at' 155. The Second Circuit agreed.
The Second Circuit looked to the “ordinary or natural meaning of the words chosen by Congress, as well as the placement and purpose of those words in the statutory scheme.” Id. at 159 (quoting United States v. Aguilar, 585 F.3d 652, 657 (2d Cir.2009)). ' It reasoned that “[i]n ordinary usage ... a person carrying a single unspent pistol cartridge ... is hardly deemed by virtue of this to be armed with gunpowder or an explosive.” Id. at 161. Also relevant to its analysis was that, in the context of the statute’s definition of “explosive,” it listed other serious explosives including those “used in detonation, a particularly fierce and explosive chemical reaction.” Id. at 161 (citation and internal quotation marks omitted). It explained that “words and people are known by their companions,” id. at 161 (quoting Gutierrez v. Ada, 528 U.S. 250, 255, 120 S.Ct. 740, 145 L.Ed.2d 747 (2000)), and, thus, the serious and' substantial nature of the other explosives listed suggests that the tiny amount of gunpowder used to fire a gun does not constitute “an explosive” within the meaning of § 844(h)(1), id. at 160-61. The court concluded:
We do not think Congress intended this result, nor do we think the Govern-mént’s interpretation: of § 844(j) [which defines “explosive” for purposes of § 844(h)(1) ]—that a single 9-millimeter cartridge falls within its definition of explosive, simply because the cartridge contains a small quantity of gunpowder—is reasonable.
Id. at 161.
The same reasoning applies here to the word “fire.” In the statute, “fire” is a companion to the word “explosive.” To put it in the Second Circuit’s terms, “[i]n ordinary usage” someone who uses the thermal lance tool to commit a bank larceny by melting through the metal backing to the ATM is “hardly deemed by virtue of this to be [using fire].” Id. at 161. Furthermore, the statutory context; in which § 844(h)(1) places “fire” directly next to “an explosive” suggests that Congress intended the words to be interpreted in the same manner. Gutierrez, 528 U.S. at 254-58, 120 S.Ct. 740. Because the statute defines “explosive” as referring to those more serious and substantial uses of explosives as described in Graham, and not “mini-explosions,” we think it also intends “fire” to .refer to a more substantial occurrence .than the incidental emission of sparks or a “flickering-flame,” which could *1018 at most be described as a “mini-fire” at the tip of the thermal lance. 691 F.3d at 161. We reach the same conclusion with respect to “fire” that the Second Circuit reached with respect to “explosive” when construing the meaning of § 844(h)(1) in accordance with the “ordinary usage” of the term at issue. Id. Like the Second Circuit, we reject the definition proposed by the government.
III.
The government’s proposed statutory construction “sweep[s] within the ambit of the statute a wide range of conduct that cannot reasonably be characterized as [using fire].”[11] United States v. Cabaccang, 332 F.3d 622, 631 (9th Cir.2003) (citations omitted). Such an overly broad interpretation also violates the precept that “[w]henever possible, “we interpret statutes so as to preclude absurd results.’ ” Id. at 631 (citations omitted); see also Arizona St. Bd. for Charter Schs. v. U.S. Dep’t of Educ., 464 F.3d 1003, 1008 (9th Cir.2006) (“[Statutory interpretations which would produce absurd results are to be avoided.”) (internal quotation marks omitted).
At oral argument, government’s counsel urged us to accept his contention that the “prototypical example of fire” is a “wooden match stick.” Oral Argument at 27:58, United States v. Thompson, et al., (No. 10-50381+ ). Overlooking this prototypical analytical error,[12] if using a match constitutes “us[ing] fire” within the meaning of § 844(h)(1), then a drug addict in possession of more than five grams of crack-cocaine, using a match to light his crack pipe, would be subject to a ten-year enhancement because he used fire to commit his felony drug offense. Likewise, operating, or even working in, a “chop shop” that uses tools like the thermal lance to take apart stolen cars would trigger a similar enhanced sentence. Manufacturing methamphetamine (or “cooking meth”), which is often done by using a burner, would be punished far more harshly if a gas burner rather than an electric stove were used, even though either may be employed to make the same drug. Even destroying evidence by burning it in a fireplace or incinerator would subject the defendant to an enhanced penalty of 10 years or more that could not be imposed had he chosen a different method of destruction. Applying the mandatory ten- or twenty-year penalty enhancement to such conduct would be absurd.
The Second Circuit likewise found the logical extension of the government’s position in Graham to be untenable because it *1019 “would mean that the getaway driver in every bank robbery would be subject to § 844(h)” because the internal combustion engine relies on a “mini-explosion;” likewise, any individual merely carrying a pistol cartridge during the commission of a felony, even telemarketing fraud or software piracy, could trigger the statute’s enhanced penalty. 691 F.3d at 161, 163. The absurd results sought by the government in Graham and the case before us simply constitute one more reason to reject its position—one leading to clearly unforeseen and undesired results by punishing conduct that Congress did not intend—in favor of the more common sense interpretation that Congress intended.
IV.
Equally relevant, the purpose, context, and history of the statute make clear that it was not intended to apply to the use of a tool such as the thermal lance that is not designed to cause fire. Rather, it was envisioned to apply'to uses of fire'that directly cause the harm.
Congress enacted the Anti-Arson Act of 1982, to add “fire” to the statute at issue, which previously applied only to uses of “explosives.” Pub.L. No. 97-298, 96 Stat. 1319. Under the older version of the statute, federal law enforcement could prosecute arson-type crimes only when they were started by explosives, which required “extensive physical and chemical inventory of debris at the fire scene.” H.R.Rep. No. 97-678, 97th Cong., 2d Sess. (July 28, 1982); see also 128 Cong. Rec. S4059-63 (April 27, 1982). These logistical problems caused federal arson investigators to waste valuable resources trying to determine whether a particular fire was started by explosives or by liquid accelerants, like gasoline. See 128 Cong. Rec. S11985-86 (Sept. 22, 1982). The Anti-Arson Act amendments, adding “fire” to several provisions of the statute, were intended to address this problem.[13]
The legislative history establishes that Congress intended “fire,” as used in § 844(h)(1), to apply to uses of fire such as burning down of buildings “to conceal homicide, and for fraud against insurance companies.” H.R.Rep. No. 97-678. Congress was especially concerned with the risk to people and the costs of arson and arson-like fires. See 128 Cong. Rec. H4957-60 (Aug. 2, 1982) (statement of Rep. Moffett) (“[Fjire in the United States kills 8,000 people each year. It injures as many as 300,000 persons,.... ”), (statement of Rep. Sawyer) (“The devastating crime of arson ... costs the taxpayers billions of dollars each year and kills and injures thousands.”); 128 Cong. Rec. S11985 (Sept. 22, 1982) (statement of Sen. Glenn) (“Each year arson kills 1,000 people, injures in excess of 3,000 people, causes direct property losses of at least $1.7 billion.”). Clearly, Congress was concerned with the damage that fire directly causes to life and property, not with the effect of incidental sparks or a “flickering flame” on the ability to use a thermal lance or other tool.
Congress gave no indication whatsoever that it intended that the statute be used to prosecute the use of a tool such as a thermal lance that, when used in the ordinary manner, does not contemplate starting fires. Every item of legislative history reveals that Congress envisioned the “uses *1020 fire” language to be applicable to cases of substantial fire, where the fire directly does the harm, particularly where people are injured or killed, e.g. arson. See, e.g., 128 Cong. Rec. H4957-60 (Aug. 2, 1982) (statements of Rep. Moffett and Rep. Sawyer); 128 Cong. Rec. S11985 (Sept. 22, 1982) (statement of Sen. Glenn). Thus, even if we accepted the government’s position that the thermal lance uses fire, we would still hold that § 844(h)(1) does not apply because Congress did not envision the use of the penalty provision to punish the employment of a tool to melt metal in the course of committing a bank larceny.
V.
If we had any doubt remaining as to whether § 844(h)(1) penalized defendants’ conduct as a use of fire to commit a felony, reversal would nonetheless be compelled by the rule of lenity.
The application of the rule of lenity is required because defendants did not have “fair warning” that their conduct was subject to the enhanced penalty of § 844(h)(1). See McBoyle v. United States, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931). The “touchstone” of this question “is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant’s conduct was criminal.” United States v. Lanier, 520 U.S. 259, 267, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).
The government has sought enhanced penalties under § 844(h)(1) exclusively for arson and arson-like crimes[14] and cross-burnings as in United States v. Wildes, 120 F.3d 468 (4th Cir.1997), and United States v. Hayward, 6 F.3d 1241 (7th Cir.1993). The government advises us of no other case in which the use of a thermal lance (or similar device or tool) was prosecuted under § 844(h)(1), despite there having been many criminal cases involving the use of such tools.[15] Neither the statute nor prior applications of it gave the defendants in this case fair warning that their use of a thermal lance, rather than another cutting *1021 tool, to commit a bank larceny rendered them subject to additional ten- and twenty-year penalties.
CONCLUSION
For the reasons explained above, we conclude that defendants’ use of the thermal lance does not fall within the scope of the penalty enhancement. We therefore reverse defendants’ convictions under § 844(h)(1). Because defendants’ conspiracy convictions under § 844(m) were predicated on the assumption that defendants’ conduct fell within the ambit of § 844(h)(1), we likewise reverse the convictions on the conspiracy counts. See United States v. Barone, 71 F.3d 1442, 1447 (9th Cir.1995). We vacate the sentences on the bank larceny counts and remand for resentencing.
REVERSED, VACATED, and REMANDED.

. Defendant Samuel Eaton was convicted of two separate incidents and, as a result, received a thirty-year enhancement.

. Thompson and Dawson raise additional arguments on appeal that relate to the bank larceny counts. We reject these arguments in a memorandum disposition filed concurrently with this opinion. Because Eaton does not challenge his convictions for bank larceny, yve do not address them. Thus, all of the bank larceny convictions stand, and we remand to the district court for resentencing on the bank larceny counts alone.

. Williams agreed to testify against his co-conspirators as a condition of his plea agreement.

. About a week later, on February 5, 2008, Eaton and Williams committed another bank larceny using the thermal lance at a Bank of America ATM in Duarte, California. Thompson and Dawson were not charged with the second bank larceny, but otherwise the facts were analogous. Because the facts of the second bank larceny are analogous, we do not mention them here.

.Thompson and Dawson were not with Eaton at the time of the crime. As a result, Thompson and Dawson were charged and convicted under conspiracy and aiding and abetting theories of liability for their involvement.

. Before trial, each of defendants sought to have the "uses fire” charges dismissed as a matter of statutory interpretation on the ground that § 844(h)(1) does not apply to the use of a thermal lance tool. The district court denied the motions, rejecting defendants' statutory interpretation argument as a matter of law, but permitting defendants to move for acquittal at the close of evidence. Defendants moved for acquittal, which the district court again denied. Thus, although the government attempts to characterize defendants', appeal as one challenging the sufficiency of the evidence, the question raised is clearly one of statutory interpretation that we review de novo. United States v. Graham, 691 F.3d 153, 156 n. 3 (2d Cir.2012), vacated on other grounds, -U.S. -, 133 S.Ct. 2851, 186 L.Ed.2d 902 (2013) (deciding a question of statutory interpretation of § 844(h)(1) and, thus, "not addressing the argument] ... that the evidence presented at trial was insufficient to convict”); see also United States v. Wright, 625 F.3d 583, 590 (9th Cir.2010) (reviewing "de novo” a "challenge to the sufficiency of the evidence, including questions of statutory interpretation”) (internal citations omitted).

. 18 U.S.C. § 844(h) provides:
Whoever—•
(1) uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States, ... in addition to the punishment provided for such felony, [such person shall] be sentenced to imprisonment for 10 years [to run consecutively]. In the case of a second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for 20 years [to run consecutively].

. In this case, for example, the area surrounding the ATM, included singed bills, some burnt tiles, soot on the walls, and the smell of smoke. Although each of these is a burning-type damage that could also have been caused by fire, here, the damage was caused by the extreme heat generated by the thermal lance tool as it cuts through the metal surface.

. The thermal lance can be used underwater. Fire would not sustain if submerged in water.

. The Supreme Court granted certiorari, vacated the judgment, and remanded on grounds not related to the interpretation of § 844(h)(1). Graham v. United States,-.U.S. -, 133 S.Ct. 2851, 186 L.Ed.2d 902 (2013). We find the Second Circuit's reasoning persuasive.

. The dissent's interpretation suffers from the same flaw. The only answer given to the obvious overinclusiveness of its interpretation is that "[t]he task of deciding whether a case involves potential violations of [a statute] falls upon the federal prosecutor....” Dissent at 1027. This is true as far as the decision to prosecute, but the ultimate task of statutory interpretation is for the judiciary and not the prosecutor. After all, "prosecutorial discretion is not a reason for courts to give improbable breadth to criminal statutes.” Abuelha-wa v. United States, 556 U.S. 816, 823 n. 3, 129 S.Ct. 2102, 173 L.Ed.2d 982 (2009). Judges (and juries), not prosecutors, decide whether a defendant is guilty of a criminal act. We may not abdicate our judicial responsibility to ensure that criminal statutes are enforced in the manner Congress intended and in line with the Constitution's guarantee of due process merely because a prosecutor has some creative argument as to why the statute may be stretched to an almost obscene degree.

. The Latin phrase pars pro toto, “part for the whole,” best describes the government's error here. The fallacy is confusing an aspect of the thing for the thing itself, specifically here, it is incorrect to conclude that because a "wooden match stick” could, in some circumstances, cause "fire,” that it is “fire.”

. The Anti-Arson Act amended Title XI of the Organized Crime Control Act of 1970 by inserting “fire or” after "by means of” in subsections (e), (f), and (i), and by inserting "fire or” after "uses” in subsection (h)(1). The amended-version of § 844(h)(1) applies to "[w]hoever [] uses fire or an explosive to commit any felony.” Pub.L. No. 97-298, 96 Stat. 1319 (emphasis added).

. See United States v. Challoner, 583 F.3d 745 (10th Cir.2009) (defendant used molotov cocktail to set a diversionary fire at an abandoned elementary school in order to rob a nearby bank); United States v. McAuliffe, 490 F.3d 526 (6th Cir.2007) (arson in furtherance of mail fraud); United States v. Ihmoud, 454 F.3d 887 (8th Cir.2006) (arson in furtherance of mail fraud); United States v. Grassie, 237 F.3d 1199 (10th Cir.2001) (convicted under § 844(h)(1) for felony destruction of church by fire); United States v. Yanlcowski, 184 F.3d 1071 (9th Cir.1999) (activist that set fire to abortion clinic charged under § 844(h)(1) in violation of the Hobbs Act); United States v. Ruiz, 105 F.3d 1492 (1st Cir.1997) (convicted under § 844(h)(1) for arson in furtherance of mail fraud to collect insurance proceeds).

. See United States v. Newsom, 508 F.3d 731 (5th Cir.2007) (defendant not charged with § 844(h)(1) for using a "cutting torch” to open a storage unit and steal explosives); United States v. Ross, 43 Fed.Appx. 751 (6th Cir.2002) (defendants not charged with enhanced penalties under § 844(h)(1) for manufacture of methamphetamine with an acetylene torch); United States v. Barnhill, 213 F.3d 643 (9th Cir.2000) (unpublished) (defendants not charged with enhanced penalties under § 844(h)(1) for using cutting torches in a bank larceny); United States v. Harty, 930 F.2d 1257 (7th Cir.1991) (defendants not charged with enhanced penalties under § 844(h)(1) for attempted vault larceny with an acetylene torch); United States v. Porter, 881 F.2d 878 (10th Cir.1989) (defendants not charged with enhanced penalties under § 844(h)(1) for bank larceny with acetylene torch); United States v. Molinares Charis, 822 F.2d 1213 (1st Cir.1987) (defendants not charged with, enhanced penalties under § 844(h)(1) for use of a cutting torch to alter a bulkhead of a boat in an attempt to conceal drugs they intended to distribute); United States v. Kupa, No. 10-CR-65-01, 2011 WL 3555731 (E.D.N.Y. July 27, 2011) (defendant did not receive enhanced penalties under § 844(h)(1) for bank burglary with blow torch).