**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

KENYON NEAL LYLE, JR.,
*Defendant-Appellant*.

No. 12-30389

D.C. No.
2:10-cr-06070-EFS-1

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Edward F. Shea, Senior District Judge, Presiding

Argued and Submitted
November 8, 2013—Seattle, Washington

Filed February 5, 2014

Before: Mary M. Schroeder, Richard A. Paez,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## SUMMARY[*]

### Criminal Law

The panel affirmed the district court's denial of a motion to dismiss an indictment charging two counts of violating 18 U.S.C. § 1365(a), which prohibits tampering with any consumer product that affects interstate commerce or foreign commerce, or the labeling of, or container for, any such product.

The panel held that the indictment – which specifically alleged that the defendant opened a box containing Fentanyl patches, removed the patches, and re-glued the box – sufficiently alleged tampering with the container for a consumer product in violation of § 1365(a).

### COUNSEL

Jeffry Keith Finer, Spokane, Washington, for Defendant-Appellant.

Alexander C. Ekstrom, Assistant United States Attorney, Yakima, Washington, for Plaintiff-Appellee.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

BERZON, Circuit Judge:

Kenyon Lyle was indicted on two counts of violating 18 U.S.C. § 1365(a), which prohibits "tamper[ing] with any consumer product that affects interstate or foreign commerce, or the labeling of, or container for, any such product . . . ." Lyle moved to dismiss these counts pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), asserting that the conduct alleged in the indictment did not constitute "tamper[ing]" within the meaning of § 1365(a). The district court denied the motion to dismiss. We affirm.

**I.**

Lyle worked as a pharmacist at a Safeway in Kennewick, Washington. After a customer filed a police report alleging she had purchased an empty box of Fentanyl patches,[1] the pharmacy was investigated, and twelve additional empty boxes were discovered. The investigation turned to Lyle, and he was charged with, *inter alia*, tampering with a consumer product in violation of § 1365(a). Specifically, the indictment alleged that Lyle:

> with reckless disregard for the risk that another person would be placed in danger of bodily injury, and under circumstances manifesting extreme indifference to such risk, did tamper with a consumer product that affected interstate and foreign commerce, specifically Fentanyl, and with the labeling of

---

[1] Fentanyl patches are applied to the skin to treat chronic pain.

and container for such a product by opening the manufacturer's box containing Fentanyl patches, by removing said Fentanyl patches, by re-gluing said manufacturer's box and returning said manufacturer's boxes to a secured narcotics storage cabinet, all in violation of Section 1365(a) of Title 18 of the United States Code.

Lyle moved to dismiss these counts for failure to state an offense. The district court denied the motion, reasoning that the indictment charged Lyle "not only with tampering with the patches, but also tampering 'with the labeling of *and container for*' the Fentanyl patches, and it allege[d] facts that constitute tampering with the patches' containers." The district court concluded that "[t]he charged conduct thus tracks the language of § 1365(a), which ends the Court's Rule 12 inquiry."

Lyle entered a guilty plea, and was sentenced to 48 months in prison. He reserved the right to appeal the district court's denial of his motion to dismiss the tampering charges.

## II.

We review de novo the denial of Lyle's motion to dismiss the indictment on the basis of the district court's interpretation of § 1365(a). *See United States v. Boren*, 278 F.3d 911, 913 (9th Cir. 2002). "In ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, [we are] bound by the four corners of the indictment." *Id*. at 914. We "must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged." *Id.*

Lyle asks us to reverse the district court's holding that the indictment sufficiently alleged "tamper[ing]" within the meaning of § 1365(a). He contends that the alleged acts of "opening" the box and "removing" the Fentanyl patches "support no more than a theft[,]" and "re-gluing" the box and "returning" it to the storage cabinet are "acts of . . . concealment" — not tampering. Because theft of a consumer product does not constitute "tamper[ing]" under § 1365(a), Lyle urges us to hold that the indictment failed to state an offense. We decline to do so.

Section 1365(a) punishes "[w]hoever, with reckless disregard for the risk that another person will be placed in danger of death or bodily injury and under circumstances manifesting extreme indifference to such risk, tampers with any consumer product that affects interstate or foreign commerce, or the labeling of, or container for, any such product . . . ." There are thus three distinct ways to violate § 1365(a): (1) by "tamper[ing]" with a consumer product; (2) by "tamper[ing]" with the labeling of a consumer product; or (3) by "tamper[ing]" with the container for a consumer product. Congress did not define the term "tamper[ .]" *See* 18 U.S.C. § 1365(h).

When a term is undefined, we first ask "whether the 'ordinary, contemporary, [and] common meaning' of the language answers the question." *United States v. Thompson*, 728 F.3d 1011, 1015 (9th Cir. 2013) (alteration in original) (citation omitted). In interpreting the plain language of a statute, we "constru[e] the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." *Boren*, 278 F.3d at 914–15. But where "the language is ambiguous or is capable of more than one reasonable interpretation, we 'consult the legislative history,

to the extent that it is of value, to aid in [the] interpretation.'"
*Thompson*, 728 F.3d at 1015 (citation omitted).

**A.**

Lyle asserts that "Congress intended the term 'tamper' to mean either an adulteration of the contents or an alteration of its container or labeling." He offers several dictionary definitions in support of his interpretation. The two definitions provided by Black's Law Dictionary best illustrate the disagreement between the parties. The first definition is "[t]o meddle so as to alter (a thing); esp., to make changes that are illegal, corrupting, or perverting." *Tamper Definition*, Black's Law Dictionary 1592 (9th ed. 2009). Lyle would have us adopt this definition. The government advocates for a second, broader definition: "[t]o interfere improperly; to meddle." *Id.*

Both definitions are well supported. The Oxford English Dictionary, for example, defines "tamper" as both "[t]o have to do or interfere with improperly; to meddle with (a thing)," and "[t]o meddle or interfere with (a thing) so as to misuse, alter, corrupt, or pervert it." *Tamper Definition*, http://www.oed.com/ (last visited Dec. 27, 2013). The American Heritage Dictionary defines "tamper" as "to interfere in a harmful or disruptive manner; meddle[,]" "[t]o make alterations or adjustments, especially secretly so as to subvert an intended purpose or function[,]" "[t]o tinker rashly or foolishly[,]" and "to alter improperly" — thus encompassing both a broader "interfere" or "tinker" and a narrower "alter" meaning. *Tamper Definition*, http://www.ahdictionary.com/ (last visited Jan. 7, 2014). The Merriam-Webster Dictionary refers to the criminal charge of "tampering with consumer products" as an example of its

fourth definition: "to render something harmful or dangerous by altering its structure or composition." *Tamper Definition*, http://www.m-w.com/dictionary/tamper (last visited Dec. 27, 2013).

Thus, although relevant sources support the narrower definition advocated by Lyle, dictionaries alone fail to provide a single "ordinary, contemporary, [and] common" definition of "tamper[ing]" within the meaning of § 1365(a). *Thompson*, 728 F.3d at 1015. Mere meddling with a consumer product or its packaging could be sufficient to establish "tamper[ing]"; but "tamper[ing]" could *also* mean that a defendant must meddle in a way that alters or adulterates the product or its packaging. We therefore consider the legislative history of § 1365(a), as well as "its object and policy, to ascertain the intent of Congress." *Boren*, 278 F.3d at 914–15.

**B.**

The Federal Anti-Tampering Act was enacted in 1984, in the wake of a series of deaths resulting from consumers ingesting Tylenol laced with cyanide. *See* S. Rep. No. 98-69, at 3 (1983); H.R. Rep. No. 98-93, at 3 (1983). Congress assumed that the deaths occurred because "one or more persons purchased the capsules, tampered with them, reinserted the capsules into the bottles and boxes in which they were sold, and then surreptitiously placed them on the store shelves from which the victims purchased them." S. Rep. No. 98-69 at 4. As a result of the cyanide poisonings, the manufacturer of Tylenol suffered serious damage to its business, and copycat crimes were reported, including false tampering claims that scared consumers. *Id.*

The Senate and House both took up the anti-tampering cause. The Senate's version of the bill, Senate Bill 216, originally applied to "[w]hoever, with intent to kill, injure or otherwise endanger the health or safety of any person or to cause significant damage or injury to the business of an individual . . . *tampers with and thereby taints, or tampers with and thereby renders materially false or misleading* the labeling of . . . or container for . . . any household product . . . ." S. 216, 98th Cong. (1983) (emphasis added). This version of the bill reflected the understanding that any tampering had to cause a change in the product or its packaging. Indeed, the Senate Report specifically adopted the following, narrow definition of "tamper":

> "Tamper" is a word of common usage and of general understanding. . . . It is defined in Webster's New International Dictionary (Merriam), 2nd Edition as: "3. To meddle *so as to alter a thing*; esp. to make corrupting or perverting changes, as to tamper with a document or a text; to interfere with improperly." The term "tamper," when used in a criminal statute "has the limited meaning of improper interference 'as for the purpose of *alteration*, and to make *objectionable or unauthorized changes*.'"

S. Rep. No. 98-69 at 7 (quoting *State v. Harlston*, 565 S.W. 2d 773, 778–89 (Mo. 1978)) (emphasis added). Senate Bill 216 passed the Senate on May 9, 1983 by a voice vote. *See* 129 Cong. Rec. 11,510 (1983).

The House then took the bill under consideration, and amended subsection (a) to include the language ultimately

enacted: "[w]hoever, with reckless disregard for the risk that another person will be placed in danger of death or bodily injury and under circumstances manifesting extreme indifference to such risk, tampers with any consumer product that affects interstate or foreign commerce, or the labeling of, or container for, any such product, or attempts to do so, shall . . . ." 129 Cong. Rec. 26,464 (1983). The House version thus lowered the mes rea requirement from intent to recklessness, and removed the Senate's requirement that an individual "tamper[] with *and thereby taint[]*, or tamper[] with *and thereby render[] materially false or misleading*" for a conviction under § 1365(a). Although the amendment's sponsor, Congressman William J. Hughes, did not directly explain the reason for these changes, speaking to the House, he described the difference between "tampering" and "tainting":

> "Tainting". . . is broader than the concept of "tampering" . . . . "Tampering" requires affirmative human conduct that changes the nature of the product, in a manner that causes a risk of death or bodily injury. "Tainting," . . . means "to modify with a trace of something offensive or deleterious, or to infect, contaminate, or corrupt[,] * * * such an 'offensive' or 'contaminating' result would be the addition of an unsightly or nauseating substance, as well as a dangerous substance."

129 Cong. Rec. 26,465 (1983).

After passing the House, *id.* at 26,466, the amended bill went back to the Senate the next day, where it was championed by Senator Strom Thurmond. *See id.* at 26,610.

Senator Thurmond described the differences between the House and Senate versions, including that "[t]he House amendment deletes the references to tainting and material misbranding in the basic tampering offense." *Id.* at 26,612. But he noted that "[s]ince the basic offense involves a risk of death or injury, *the tampering activity will necessarily encompass a tainting or material label alteration*, and those requirements need not be spelled out." *Id.* (emphasis added). The legislative history thus shows that both houses of Congress viewed "tamper[ing]" as requiring some alteration of the product or its packaging. The Senate accepted the House's version of the bill that omitted the requirement that the tampering "thereby taint" or "thereby render materially false or misleading" because it thought the language unnecessary, not inaccurate.

In light of Congress' clear statements upon enacting § 1365(a), and consistent with the rule of lenity, *see United States v. Santos*, 553 U.S. 507, 514 (2008), we agree with Lyle that the more restrictive definition of "tamper" — one that requires alteration or adulteration of the item tampered — should apply.

## C.

Our conclusion is supported by the few court of appeals decisions construing § 1365(a). For example, the Eighth Circuit wrote that "the term 'tampers' . . . describes the physical act of product adulteration." *United States v. Moyer*, 182 F.3d 1018, 1020 (8th Cir. 1999). *Moyer* concerned a physician who stole morphine from her patients' IV units and replaced the drug with saline. She challenged her conviction on the ground that the term "tampers" requires a showing of malicious intent. *Id.* The court declined to read such an

intent into the statute, but in so doing, suggested that the "ordinary meaning of the term" "tamper" requires "adulteration." *Id.* at 1020–21.

*United States v. Garnett*, 122 F.3d 1016 (11th Cir. 1997), likewise supports the narrower definition of "tamper[ing]." *Garnett* held that "removing a drug and replacing it with a substitute constitutes tampering under § 1365(a)." *Id.* at 1018. In support of its conclusion, the Eleventh Circuit noted that the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301, which § 1365(a) was designed to strengthen, "defines substitution as a form of adulteration." *See Garnett*, 122 F.3d at 1018 (citing 21 U.S.C. § 351(d)). Notably, the court did not hold Garnett liable simply because he removed some hydrocodone tablets from a bottle. Rather, it held that Garnett "reduced the efficacy of [the] bottle . . . by *introducing other drugs into the bottles* after scratching off their identifying marks." *Id.* (emphasis added). It was that act, which adulterated the consumer product, that constituted "tamper[ing]" within the meaning of § 1365(a).

## III.

The indictment here sufficiently alleged "tamper[ing.]" The indictment specifically alleged that Lyle "open[ed]" a box containing Fetanyl patches, "remov[ed]" the patches, and "re-glu[ed]" the box. Combined, the acts of opening a box and re-gluing it closed alter that box. Opening a box eliminates the secure closure affixed in the factory, which assures that the contents of the box remain as represented on it until sold. Re-gluing a box alters the container further, by introducing a material — new glue — not installed by the manufacturer, and by creating a false impression of a secure package. Taken together, these acts constitute "tamper[ing]

with . . . [the] container for" a consumer product in violation of § 1365(a).**²**

We find unpersuasive Lyle's citation to a 2002 House Report, which describes § 1365(a) as having "le[ft] unregulated conduct which neither adulterates the actual product nor alters the labeling." H.R. Rep. No. 107-485, at 2 (2002). Relying on this statement, Lyle contends that merely altering the "container for" a consumer product, as he is alleged to have done, does not violate § 1365(a). "In evaluating the weight to be attached to th[is] statement[]," we consider "the oft-repeated warning that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980) (citations omitted). A congressional statement made twenty years after the enactment of § 1365(a) is of little use in ascertaining the statute's meaning. This admonition is particularly pertinent where, as here, the post-enactment summary cannot be reconciled with the statute's language, which specifically prohibits tampering with a *container*, as well as with the product and its label. *See* § 1365(a).**³** Because the indictment

---

**²** Whether opening the box alone constitutes "tamper[ing]" we need not decide. As a practical matter, it is unlikely that an open box would be sold or bought, so the other elements of § 1365(a) are unlikely to be met.

**³** We note that Lyle has not challenged whether the mens rea element of § 1365(a) is met. We therefore do not decide whether "removing" Fentanyl patches from their container — essentially theft of a consumer product — and taking steps to conceal that theft by tampering with the container, demonstrates "reckless disregard for the risk that another person will be placed in danger of death or bodily injury, and under circumstances manifesting extreme indifference to such risk." § 1365(a). Although other circuits have held that any "tampering that reduces the efficacy of a drug designed to save life or alleviate a bodily injury"

sufficiently alleges that Lyle tampered with the container, we affirm.

**AFFIRMED.**

suffices for § 1365(a), *United States v. Cunningham*, 103 F.3d 553, 556 (7th Cir. 1996), this circuit has not so held.