**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 15-2796

———————

UNITED STATES OF AMERICA

v.

JOSEPH DOUGHERTY,
Appellant

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2:14-cr-00069-001)
District Judge: Hon. Michael M. Baylson

———————

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 10, 2016

———————

Before: SMITH, *Chief Judge*, McKEE and RESTREPO, *Circuit Judges*.

(Opinion filed:  August 23, 2017)

———————

OPINION*

———————

MCKEE, *Circuit Judge.*

Appellant Joseph Dougherty appeals his conviction and sentence for six counts of

———————

\* This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

RICO conspiracy, arson, and extortion interfering with interstate commerce. For the reasons that follow, we affirm the district court's judgment of conviction and sentence.

**I.**[1]

The main counts at issue on this appeal[2] pertain to an arson at a non-union construction site on Grays Avenue in Philadelphia and an attempted arson at a non-union construction site in Malvern, Pennsylvania. Both of these incidents involved the use of an acetylene torch—a tool generally used for welding—to destroy (or attempt to destroy) property. Dougherty argues, for the first time on appeal, that an acetylene torch does not constitute "uses fire"[3] or "by means of fire"[4] as Congress envisioned in 18 U.S.C. § 844, nor were the damaged properties "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce,"[5] and therefore, his convictions under Counts 5 through 8 should be reversed. Dougherty also argues that the evidence was insufficient to

---

[1] The district court had subject matter jurisdiction over the case pursuant to 18 U.S.C. § 3231. This Court has jurisdiction over this matter under 28 U.S.C. § 1291, and has jurisdiction pursuant to 18 U.S.C. § 3742 to review the sentence imposed on the defendant.

[2] Counts 5 through 8 are the focus of this appeal: maliciously damaging property by means of fire, in violation of 18 U.S.C. § 844(i) (Count 5); use of fire to commit a felony, in violation of 18 U.S.C. § 844(h) (Count 6); conspiracy to maliciously damage property by means of fire, in violation of 18 U.S.C. § 844(n) (Count 7); and attempt to maliciously damage property by means of fire in violation of 18 U.S.C. § 844(i) (Count 8).

[3] 18 U.S.C. § 844(h) imposes a ten-year sentence of imprisonment on a defendant who "uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States."

[4] 18 U.S.C. § 844(i) imposes a sentence of imprisonment of "not less than 5 years and not more than 20 years" on a defendant who "maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce."

[5] *Id.*

establish his knowledge of the acetylene torch that was used to damage the Grays Avenue site, and that he should therefore be acquitted on Counts 5 and 6. If we reject these arguments and do not reverse Counts 5 through 8, Dougherty seeks a new trial based on his claim that the district court improperly instructed the jury concerning fire and interstate commerce, and abused its discretion by failing to remove a juror during trial. He argues in the alternative that if we affirm all of his convictions, he is entitled to be resentenced because of errors the district court made in calculating his sentence.

## II.

The arguments on this appeal related to the meaning of "use of fire" and "used in interstate commerce" are questions of statutory interpretation subject to plenary review.[6]

Dougherty contends that use of the acetylene torch in connection with the Grays Avenue and Malvern incidents does not fall within the range of conduct Congress envisioned when it criminalized the use of fire under 18 U.S.C. § 844. His argument relies on *United States v. Thompson*, wherein the Court of Appeals for the Ninth Circuit held that the use of a thermal lance to cut open an ATM machine during the course of a bank larceny did not constitute the use of fire to commit a felony under 18 U.S.C. § 844(h)(1).[7] However, this case is clearly distinguishable.

Dougherty's argument incorrectly focuses on the *use* of the torch in *Thompson*, rather than the role the torch played in the commission of the charged crime. The *Thompson* defendants used the torch as a tool to allow them to gain access to the cash

---

[6] *Gibbs v. Ryan*, 160 F.3d 160, 162 (3d Cir. 1998).
[7] 728 F.3d 1011, 1016 (9th Cir. 2013).

inside an ATM machine; they did not use it to destroy the ATM itself. [8] Accordingly, the *Thompson* court observed the statute "was envisioned to apply to uses of fire that directly cause the harm," and held "that § 844(h)(1) does not apply because Congress did not envision the use of the penalty provision to punish the employment of a tool to melt metal in the course of committing a bank larceny."[9]

Conversely, here the torch was not used to facilitate commission of a distinct crime; it was the sole instrument used to commit the charged crime of damaging property by means of fire.[10] The *Thompson* decision confirmed that Congress intended conduct where the "fire directly does the harm," to be proscribed by the statute.[11] Thus, the use of the acetylene torch in this case clearly falls within the range of conduct Congress intended to criminalize under 18 U.S.C. § 844.[12]

Dougherty also argues that the government has not proven that the structures involved in these crimes were engaged in interstate commerce. He contends that the buildings, both of which were under construction, were not actively engaged in interstate

---

[8] *Thompson*, 728 F.3d at 1013. In fact, the perpetrators took measures to ensure the torch did not cause a fire in the ATM lobby. *Id.* at 1014.

[9] *Id.* at 1019–20.

[10] James Walsh, who committed the Grays Avenue damage, testified that he used the torch to cut through the building's anchor bolts and steel columns. App. 743.

[11] *Id.* (citing 128 Cong. Rec. H4957–60 (Aug. 2, 1982); 128 Cong. Rec. S11985 (Sept. 22, 1982)).

[12] *See also, United States v. Desposito*, 704 F.3d 221, 226 –29 (2d Cir. 2013) (holding that the use of fire was "integral" to bank robbery where defendant lit a car on fire to divert authorities' attention from robbery); *United States v. McAuliffe*, 490 F.3d 526, 536–37 (6th Cir. 2007) (holding that defendant used fire to commit mail fraud where he burned his home down in order to collect insurance proceeds).

4

commerce within the purview of *Jones v. United States*.[13] The government argues that because the buildings were active construction sites with supplies being delivered and used from other states, the interstate commerce nexus is satisfied. For the reasons explained below, we agree.

In *Jones*, the Supreme Court held that "an owner-occupied residence not used for any commercial purpose does not qualify as property 'used in' commerce or commerce-affecting activity; arson of such a dwelling, therefore, is not subject to federal prosecution under § 844(i)."[14] The property at issue in *Jones* differs from the property at issue here in two ways: (1) it was not under construction at the time of the arson, and (2) it was neither engaged in, nor intended to be engaged in, interstate commerce.

The property in *Jones* was an occupied family residence.[15] Here, the Malvern and Grays Avenue sites were active construction sites, and building materials from out of state were delivered to the site and were actively being used in the construction.

Additionally, a building's intended use is relevant to the interstate commerce nexus.[16] Indeed, "the proper inquiry . . . is into the function of the building itself, and then a determination of whether that function affects interstate commerce."[17] Unlike the owner-

---

[13] 529 U.S. 848 (2000).

[14] *Id.* at 850–51.

[15] *Id.* at 851.

[16] *See United States v. Williams*, 299 F.3d 250, 255 (3d Cir. 2002) (holding that a vacant building available for rent was engaged in interstate commerce); *United States v. Gaydos*, 108 F.3d 505, 511 (3d Cir. 1997) (holding that a vacant and uninhabitable building did not affect interstate commerce where the owner had no intention of ever making it habitable or rentable again).

[17] *Jones*, 529 U.S. 848 at 854–55 (internal quotations omitted).

5

occupied personal residence in *Jones*, both buildings here were being constructed in order to perform commercial activities—the Malvern site was an apartment complex and the Grays Avenue site was a warehouse. Both of these uses have already been established by prior case law to constitute commercial activities with an effect on interstate commerce.[18] This easily satisfies the required interstate commerce nexus.[19]

This conclusion is not only fatal to Dougherty's claim that the government did not establish the element of interstate commerce, it is also fatal to, and dispositive of, his related argument that the district court erred in instructing the jury on the meaning of "uses fire" under 18 U.S.C. § 844(h) and "by means of fire" under 18 U.S.C. § 844(i). Because Dougherty did not challenge the jury instructions at trial, we review for plain error.[20] Under the plain error standard, Dougherty must establish (1) an error; (2) that is plain; and (3) that affected substantial rights.[21]

Dougherty argues that the definition of "fire" in the jury instructions—"the process by which an ignited fuel combines with oxygen by giving off light, heat and flame"[22]— was "grossly overbroad and palpably misrepresented the meaning of fire under the statute."[23] Dougherty also argues that the district court's instruction on the interstate

---

[18] *See Russell v. United States*, 471 U.S. 858, 862 (1985) (holding that an apartment building being rented to tenants was "unquestionably" being used in an activity affecting interstate commerce); *United States v. Corona*, 108 F.3d 565, 570–71 (5th Cir. 1997).

[19] *See United States v. Andrini*, 685 F.2d 1094, 1096 (9th Cir. 1982) (holding that "the construction of a commercial office building using out-of-state materials is a commercial activity affecting interstate commerce for the purposes of [§] 844(i)").

[20] *See* Fed. R. Crim. P. 52(b).

[21] *United States v. Dobson*, 419 F.3d 231, 236 (3d Cir. 2005).

[22] App. 1725.

[23] Dougherty Br. 55.

commerce nexus[24] "failed to come remotely close to accurately conveying the meaning of this statutory element" and "directly contravene[d] *Jones*."[25]

As we have already explained, the use of the acetylene torch here satisfied the "fire" elements of Sections 844(i) and (h), and the evidence clearly established the nexus between the target properties and commercial activity at the sites. Therefore, we cannot say that any alleged error in the jury instructions affected Dougherty's substantial rights. Accordingly, we do not find plain error in the district court's jury instructions.[26]

Dougherty also argues that the district court erred by denying his motion for a judgment of acquittal on the Grays Avenue counts, because the evidence was insufficient to establish that he knew his co-defendants intended to damage the Grays Avenue non-

---

[24] The district court's instruction on the interstate commerce element of Count 5 serves to illustrate instructions given on Counts 5, 7, and 8:

> Conduct affects interstate commerce if it in any interference with, changes or alters the movement of transportation or flow of goods, merchandise, money or other property in commerce between one state and another state or any place outside that state.
> The effect can be minimal. It is not necessary to prove that Joseph Dougherty intended to obstruct, delay or interfere with interstate commerce or that the purpose of the alleged crime was to affect interstate commerce.
> Further, you don't have to decide whether the effect on interstate commerce was to be harmful or beneficial to a particular business or to commerce in general.
> You do not even have to find that there was an actual effect on commerce. All that is necessary to prove this element is that the natural consequences of the offense potentially caused an effect on interstate commerce to any degree, however minimal or slight.

App. 1726.

[25] Dougherty Br. 57.

[26] This finding also precludes us from reaching Dougherty's argument that his conviction under Count 1 must be vacated because his "convictions under Counts Five through Eight were invalid at least because they rested on an erroneous understanding of the law." Dougherty Br. 59. We find no such error, and therefore will not consider this argument.

7

union worksite and/or to use the acetylene torch to do so. Dougherty argues that the totality of the evidence only shows that Dougherty (1) knew the Local 401 ironworkers had damaged the Quaker Meetinghouse jobsite and burned a crane there (but nothing about a torch being involved), (2) that union member Walsh was involved in the Quaker Meetinghouse incident, and (3) that Walsh had come by the union hall before the Grays Avenue incident, and Dougherty helped him find the torch. Thus, Dougherty argues, the evidence is insufficient to prove that he knew that Walsh planned to use the torch at the Grays Avenue site and aided him in doing so.

Our review of the sufficiency of the evidence is a "highly deferential" analysis,[27] in which we ask, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[28] We need not respond to this argument in any detail as it is defeated by the evidence summarized in Dougherty's own brief.[29]

Dougherty next argues that the district court abused its discretion by refusing to remove a juror for alleged bias. This juror, after trial had commenced, advised the district court's deputy that "two of [her] friends are friends with Mr. O'Neill," who was the developer of the property in Malvern, but who did not testify at trial.[30] The district court then colloquied the juror, who stated that she had never talked to O'Neill, could not recall

---

[27] *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc).
[28] *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).
[29] *See* Dougherty Br. 20–34.
[30] App. 545, 548.

8

ever meeting him, and could not recall his first name.[31] After several questions about her impartiality, the juror ultimately stated she could be fair.[32] Dougherty requested the court excuse the juror because she was "equivocal at best" about her ability to be fair, and the court held the issue under advisement. At the end of the case, after the district court had charged the jury, Dougherty renewed his motion to recuse the juror, pointing out that the contractor (O'Neill Properties) was mentioned several times during trial, and four alternate jurors were available. The district court concluded that the juror would stay, because (1) the juror's relationship with O'Neill was extremely tangential; (2) there was no dispute that the alleged damage occurred; and (3) many potential jurors initially doubt their ability to be impartial. Dougherty argues that, in making this determination, the district court found that the juror "readily said" she could be fair and impartial, which reflects an "erroneous understanding" of the earlier colloquy and therefore should not be given any special deference.[33] We disagree.

---

[31] *Id.* at 547.

[32] The district court's final question was, "Now would the mere fact that O'Neill Properties was one of the victims, would that prevent you from being a fair and impartial juror?" The juror responded, "No." App. 552.

[33] Dougherty Br. 62–63. Here, Dougherty points to the following statement from the district court regarding the juror in question:

> Well, you know, a lot of potential jurors have initial reactions and they think they know somebody in the case or that they've heard about the case—you know, that they can't be fair.
> We hear that all the time and then if you explain to jurors that, you know, the purpose of a trial is to present evidence under the Rules of Evidence and we ask them can you—you know, if you would consider that principle and could you decide the case based on what happens in the courtroom, *she readily said she could do that*.

App. 1771 (emphasis added).

The record supports the court's crediting the juror's response that she could be fair and impartial, particularly in light of her attenuated connection to O'Neill, and O'Neill's peripheral relationship to the case. The district court did not abuse its discretion in denying Dougherty's motion to strike this juror.

Finally, Dougherty makes several arguments regarding his sentence: (1) the district court made two procedural errors in making his sentencing guidelines calculation, and (2) the sentence is substantively unreasonable. Dougherty first argues that the district court erred in calculating his guideline range by including the Toys-R-Us baseball bat attack[34] in the guideline calculation under relevant conduct principles, because that attack was not reasonably foreseeable to him.[35] However, we agree with the government that the record shows that the Toys-R-Us incident was readily foreseeable to Dougherty. The evidence, which included recorded conversations, proved that Dougherty expressly approved of one of the attacker's criminal actions on behalf of the union and sought to elevate him in the union hierarchy. Thus, the district court did not err by considering this incident in determining Dougherty's sentence.

Dougherty next argues that the district court erred by applying a four-level leadership enhancement for his role in the RICO conspiracy. He claims that none of the

---

[34] In June 2010, at the construction site of a Toys-R-Us store near King of Prussia, three union members attacked non-union workers with baseball bats. They smashed the windows on the workers' truck and beat one worker so badly he was sent to the hospital. Two of the attackers later pled guilty to charges in state court. App. 820–43.

[35] The district court applied U.S.S.G. § 1B1.3 in determining the guideline range as it relates to the Toys-R-Us incident.

10

factors set forth in Application Note 4 of U.S.S.G. § 3B1.1,[36] are present here, and that his "involvement in the criminal conduct underlying his conviction was nominal to non-existent."[37] Dougherty further claims that the court erred by failing to independently assess his role in each incident, and by imposing the enhancement for the Toys-R-Us extortion, because there is no evidence that he played a leadership role in that episode. We agree with the government that the problem with this argument, and indeed many of Dougherty's arguments, is that he "simply ignores his overarching role in these activities and instead focuses on his lack of *direct* involvement in many of these individual acts."[38] The evidence shows that Dougherty was clearly a leader of the enterprise, even though he did not directly participate in the offense conduct.[39] Moreover, Dougherty cites no authority to support his position that the role enhancement was improperly applied to each of the underlying criminal acts on the basis of his leadership role in the RICO conspiracy. Thus, the district court did not err in applying the leadership enhancement.

Dougherty concludes by arguing that his below-guideline-range sentence was substantively unreasonable, because the court failed to give proper weight to his

---

[36] These factors include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, App. Note 4.

[37] Dougherty Br. 69.

[38] Gov't Br. 65 (emphasis added).

[39] *See United States v. Bass*, 54 F.3d 125, 129 (3d Cir. 1995) ("A person who plans, funds, and supervises a conspiracy's operation does not immunize himself from upward adjustment under § 3B1.1 just because he does not join in all of the mechanics and all of the various activities of the illegal enterprise. Indeed, leaders and organizers often distance themselves from the actual implementation of the conspiracy.").

arguments for leniency. Specifically, defense counsel argued that Dougherty was elderly, in frail condition, only tangentially involved in any criminal activity, and had a tremendous amount of community support. Dougherty argues that the district court's variance to 230 months does not properly reflect all the mitigating factors at issue in this case and, therefore, is substantively unreasonable. These arguments, however, fail to establish that "no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided."[40] The fact that the court did not give mitigating factors the weight a defendant contends they deserve does not render a sentence unreasonable or show an abuse of discretion. Here, the record shows that the district court properly balanced the applicable factors and reasonably concluded that 230 months was appropriate.

## III.

For the foregoing reasons, we will affirm the district court's judgment of conviction and sentence in their entirety.

---

[40] *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (en banc).