**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MICAH JOEL AHKEEM IVERSON
KELLY, AKA Iverson Kelly Micah
Johel Ahkeem,
*Defendant-Appellant.*

No. 16-10460

D.C. No.
2:15-cr-00041-
GMN-NJK-1

OPINION

Appeal from the United States District Court
for the District of Nevada
Gloria M. Navarro, Chief District Judge, Presiding

Argued and Submitted September 15, 2017
San Francisco, California

Filed October 30, 2017

Before: Ronald M. Gould, Richard C. Tallman,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Tallman

## SUMMARY[*]

### Criminal Law

The panel affirmed a conviction for selling and possessing with the intent to sell over 446 grams of ethylone, and dismissed the defendant's challenge to his sentence.

The panel rejected the defendant's contention that the Drug Enforcement Administration violated the non-delegation doctrine by temporarily adding ethylone as a Schedule I controlled substance. The panel explained that the plain language of the Controlled Substances Act, as codified at 21 U.S.C. §§ 811(h) and 812(b), permits the DEA to make findings for a parent substance as a basis to temporarily schedule that substance and its isomers.

The panel rejected the defendant's contention that the DEA violated due process by failing to provide adequate notice that ethylone was a controlled substance. The panel explained that the defendant received fair notice when the DEA filed the Notice and Order in the Federal Register.

The panel held that the rule of lenity does not apply because the text, history, and purpose of the Controlled Substances Act make unambiguous that Congress intended to empower the DEA to temporarily schedule isomers.

The panel held that because the intent of Congress is clear that the DEA has authority to temporarily schedule a

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

parent substance and its isomers, the district court properly accorded *Chevron* deference to the agency interpretation.

The panel held that the defendant's challenge to the district court's criminal history calculation and resulting sentence is waived.

## COUNSEL

Erica J. Choi (argued), Assistant Federal Public Defender; Rene L. Vallardes, Federal Public Defender; Office of the Federal Public Defender, Las Vegas, Nevada; for Defendant-Appellant.

Nancy M. Olson (argued), Assistant United States Attorney; Elizabeth O. White, Appellate Chief; Steven W. Myhre, Acting United States Attorney; United States Attorney's Office, Las Vegas, Nevada; for Plaintiff-Appellee.

## OPINION

TALLMAN, Circuit Judge:

Defendant-Appellant Micah Joel Ahkeem Iverson Kelly ("Kelly") challenges the district court's denial of his motion to dismiss the indictment charging him with distributing so-called "designer drugs." Kelly entered a conditional plea of guilty to selling and possessing with the intent to sell over 446 grams of ethylone under the street name "Ecstasy." On appeal, Kelly argues he preserved the following issues: (1) the Drug Enforcement Administration ("DEA") violated the non-delegation doctrine by failing to comply with the Controlled Substances Act, as codified at 21 U.S.C.

§§ 811(h) and 812(b) in temporarily scheduling ethylone;
(2) DEA violated due process by failing to provide adequate
notice that ethylone was a controlled substance; (3) the rule
of lenity applies because § 811(h) is ambiguous as to
whether DEA may temporarily schedule unnamed isomers;
(4) DEA's temporary scheduling of ethylone is not entitled
to deference under *Chevron, U.S.A., Inc. v. Natural
Resources Defense Council, Inc.*, 467 U.S. 837 (1984); and
(5) the district court erred in finding that his criminal history
category was V, instead of IV, in violation of the Sentencing
Guidelines. We have jurisdiction under 28 U.S.C. § 1291
and we affirm as to the first four issues and dismiss as to the
last, which we find barred by his partial appellate waiver.

I

Congress enacted the Controlled Substances Act
("CSA") as part of the Comprehensive Drug Abuse
Prevention and Control Act of 1970 to restrict the illegal
trafficking of various substances found to pose a danger to
the health and general welfare of the nation. Pub. L. No. 91-
513, § 101(2), 84 Stat. 1242 (codified at 21 U.S.C.
§ 801(2)).[1] The CSA makes it unlawful to knowingly
manufacture, distribute, or possess any controlled substance
except in a manner authorized by the CSA. §§ 841(a)(1),
844(a). The CSA categorizes all controlled substances into
five schedules. § 812.[2] The initial schedules established by

---

[1] All further statutory and regulatory citations are to Title 21 of the
United States Code and Title 21 of the Code of Federal Regulations,
unless otherwise noted.

[2] A controlled substance is "a drug or other substance" that is
included in Schedule I, II, III, IV, or V. § 802(6). "Control" is a term of
art in the CSA, meaning "to add a drug or other substance . . . to a
schedule." § 802(5).

Congress are found at 21 U.S.C. § 812(c), and the current schedules are published in 21 C.F.R. Part 1308. "Violations involving schedule I substances carry the most severe penalties, as these substances are believed to pose the most serious threat to public safety." *Touby v. United States*, 500 U.S. 160, 162 (1991).

The CSA authorizes the Attorney General to add, remove, or transfer substances to, from, or between schedules. § 811. The Attorney General has delegated this authority to the Administrator of the DEA, who in turn has delegated it to the Deputy Administrator. 28 C.F.R. § 0.100(b). "When adding a substance to a schedule, the [DEA] must follow specified procedures." *Touby*, 500 U.S. at 162. The DEA may add a drug to a schedule in one of two ways: permanently or temporarily.

A

To permanently schedule a drug, the DEA first must obtain a scientific and medical evaluation of the drug and a recommendation as to whether it should be controlled from the Secretary of Health and Human Services ("HHS"). § 811(b). The DEA may not schedule the drug if the Secretary recommends against it. *Id.* Second, the DEA must consider eight statutory factors, including the drug's actual or relative potential for abuse, scientific evidence of its pharmacological effect, the state of current scientific knowledge regarding the drug, the drug's psychic or physiological dependence liability, and whether it is an immediate precursor of a drug that is already controlled. § 811(c).

If the DEA wants to place the drug into Schedule I, it must also find that the drug has a high potential for abuse, no currently accepted medical use in treatment, and no

accepted safe use under medical supervision.  § 812(b)(1).[3] The DEA must then comply with the formal rulemaking provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 556–57.  § 811(a).  Lastly, it must issue a final rule adding the drug to 21 C.F.R. § 1308.11, which contains the current list of Schedule I substances.  *Id.*  This final rule, which concludes the permanent scheduling process, is subject to judicial review.  § 877.

Because of these procedural requirements, it often takes six to twelve months for the DEA to permanently schedule a new drug after the DEA identifies it. *Touby*, 500 U.S. at 163. This delay produced predictable results.  "Drug traffickers were able to take advantage of this time gap by designing drugs that were similar in pharmacological effect to scheduled substances but differed slightly in chemical composition, so that existing schedules did not apply to them."  *Id.*  "These 'designer drugs' were developed and widely marketed long before the Government was able to schedule them and initiate prosecutions."  *Id.*

B

To combat the designer drug problem and reduce the inherent regulatory delay, Congress amended the CSA in 1984 to create an expedited procedure by which the DEA can temporarily schedule a new drug 30 days after identifying it if doing so is "necessary to avoid an imminent hazard to the public safety."  § 811(h)(1); *see Touby*, 500 U.S. at 163.  A temporarily scheduled drug may only be

---

[3] These three factors, in varying gradations, are used to categorize drugs into the other four schedules.  For example, Schedule II drugs have a high potential for abuse, but they have a currently accepted medical use. § 812(b)(2).

placed into Schedule I, and only if the Secretary has not approved it for sale or exempted it for research under the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 355. *Id.* Temporary scheduling under § 811(h) allows the DEA "to bypass, for a limited time, several of the requirements for permanent scheduling." *Touby*, 500 U.S. at 163.

To find that a drug poses an imminent hazard to public safety justifying temporary scheduling, the DEA must consider only three of the eight factors required for permanent scheduling: (1) the drug's history and current pattern of abuse; (2) the scope, duration, and significance of the abuse; and (3) what, if any, risk it poses to the public health. § 811(c)(4)–(6), (h)(3). In considering these factors, the DEA must consider the drug's "actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or distribution." § 811(h)(3). In addition, the DEA must find that it has a high potential for abuse, no currently accepted medical use in treatment, and no accepted safe use under medical supervision. § 812(b)(1).

Rather than comply with the APA formal rulemaking provisions attending permanent scheduling, the DEA must provide only 30-days' notice of the proposed temporary scheduling in the Federal Register. § 811(h)(1)(A). The DEA must also transmit to the Secretary a 30-days' notice of its intent to temporarily schedule the drug, and it must consider any comments the Secretary submits in response. § 811(h)(1)(B), (h)(4). However, unlike permanent scheduling, the Secretary's prior approval of the temporary scheduling is not required. *Touby*, 500 U.S. at 163. Lastly, the DEA must issue a final order adding the drug to 21 C.F.R. § 1308.11(h). § 811(h)(1). The temporary scheduling order remains valid for two years, during which time the DEA presumably will initiate permanent scheduling

proceedings, in which case the order may be extended for an additional year. § 811(h)(2). A temporary scheduling order is not subject to judicial review, except (as here) when challenged by a criminal defendant in defense to prosecution. § 811(h)(6); *Touby*, 500 U.S. at 168.

If the drug is later permanently scheduled, it is removed from § 1308.11(h) and added to § 1308.11(b)–(g), depending on whether it is designated as an opiate, opium derivative, hallucinogenic substance, depressant, stimulant, or cannabimimetic agent. *See* § 811(h)(5).

C

On November 7, 2013, the DEA notified the Secretary by letter of its intent to temporarily schedule ten synthetic cathinones, including butylone, because doing so was necessary to avoid an imminent hazard to the public safety. Synthetic cathinones are recreational drugs popular with some youth and young adults in the United States. They produce pharmacological effects substantially similar to MDMA, cathinone, methcathinone, amphetamine, and methamphetamine. Synthetic cathinones are commonly marketed on the street as "Ecstasy" or "bath salts," sold in the form of tablets and powders, and ingested by swallowing or snorting.

The DEA's letter to the Secretary did not mention the ten synthetic cathinones' isomers[4] or salts. On December 4, 2013, the Secretary advised the DEA that there were no investigational or approved new drug applications for the ten

---

[4] An isomer is "any of two or more chemical compounds having the same constituent elements in the same proportion by weight but differing in physical or chemical properties because of differences in the structures of their molecules." *Isomer*, Webster's New College Dictionary (2009).

synthetic cathinones and that HHS had no objection to their temporary placement in Schedule I. On January 28, 2014, the DEA published in the Federal Register a Notice of its intent to temporarily schedule the ten synthetic cathinones, along with their "optical, positional, and geometric isomers, salts and salts of isomers." On March 7, 2014, the DEA issued a final Order temporarily adding the ten synthetic cathinones to Schedule I at § 1308.11(h)(19)–(28). As relevant here, the Order temporarily added "[b]utylone, its optical, positional, and geometric isomers, salts and salts of isomers" to Schedule I at § 1308.11(h)(22).[5]

II

A

In January 2015, a Nevada drug task force learned that Kelly was selling large quantities of MDMA[6], or "Ecstasy," in the Las Vegas area. An undercover officer arranged to purchase the MDMA from Kelly, and Kelly sold approximately 140 grams of powder to the officer in two separate transactions. During the third transaction, Kelly was arrested possessing another 306 grams. Forensic analysis later revealed that the powder was ethylone, not

---

[5] Three years later, after the events in this case, the DEA issued a final Rule permanently scheduling the ten synthetic cathinones. *See* 82 Fed. Reg. 12171 (Mar. 1, 2017) (codified at 21 C.F.R. § 1308.11(d)(59)–(68)). Currently, butylone and its optical, positional, and geometric isomers, salts, and salts of isomers are designated as Schedule I(c) hallucinogenic substances listed in the regulations at § 1308.11(d)(62).

[6] "*3, 4-methylenedioxy-methamphetamine* (MDMA) is a synthetic drug that alters mood and perception." National Institute on Drug Abuse, *What is MDMA?*, https://www.drugabuse.gov/publications/drugfacts/mdma-ecstasymolly (last visited Oct. 6, 2017).

MDMA. A grand jury indicted Kelly on three counts of distributing and possessing with intent to distribute "Ethylone, a Schedule I controlled substance," in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

It is undisputed here that ethylone is a positional isomer of butylone. An isomer is a molecule with the same chemical formula as another molecule, but its atoms are arranged in a different sequence. For example, butylone and ethylone share the chemical formula $C_{12}H_{15}NO_3$, but they differ in the location of a functional group:

butylone                    ethylone

Based on how the atoms are arranged, isomers can be classified as chain, functional, positional, conformational, optical, or geometric. *See A Brief Guide to Types of Isomerism in Organic Chemistry*, http://www.compound chem.com/2014/05/22/typesofisomerism/ (last visited July 24, 2017). Not all isomers of a scheduled drug are illegal, however. Thus, Schedule I categorically controls all permanently scheduled drugs' *optical* isomers only. An exception exists if the permanently scheduled drug is a hallucinogenic substance listed in § 1308.11(d), in which case Schedule I categorically controls its *optical*, *positional*, and *geometric* isomers. *See* §§ 802(14), 812(c)(I); 21 C.F.R. § 1300.01(b). Permanently scheduled hallucinogenic substances are called "Schedule I(c)" drugs, which refers to

the initial statutory schedule in which they are placed. § 812(c)(I)(C).

B

On the morning that his trial was set to begin, Kelly moved to dismiss the indictment on the ground that ethylone was not a Schedule I controlled substance. He did not contest for purposes of his motion, and does not contest on appeal, that ethylone is a positional isomer of butylone. He argued, however, that ethylone was not properly scheduled because (1) the DEA failed to comply with §§ 811(h) and 812(b)'s procedural requirements; (2) the DEA did not provide adequate notice that ethylone was a controlled substance; (3) § 811(h) was ambiguous as to whether the DEA was authorized to temporarily schedule unnamed isomers without identifying or making the requisite findings for them, and the rule of lenity required the court to resolve that ambiguity in Kelly's favor; and (4) the DEA's temporary scheduling of ethylone was arbitrary and capricious.

A magistrate judge issued a report and recommendation denying Kelly's motion, which the district court adopted in full. The district court found that § 811(h) unambiguously authorized the DEA to schedule unnamed isomers. It declined to apply the rule of lenity because the DEA's Order was not a criminal statute, but rather an administrative regulation that was entitled to *Chevron* deference. Applying *Chevron*, the court upheld the DEA's Order because (1) § 811(h) was unambiguous that the DEA could schedule ethylone as an unnamed positional isomer of butylone; and (2) the DEA's action was not arbitrary or capricious. Lastly, the court found that Kelly had adequate notice that ethylone was a controlled substance because the DEA's Notice and

Order expressly included butylone's "optical, positional, and geometric isomers."[7]

## C

After his motion to dismiss was denied, Kelly pleaded guilty to all three counts in the indictment under a conditional plea agreement that reserved his right to bring this appeal of the district court's denial of his motion to dismiss. In support of his guilty plea, Kelly admitted to selling and possessing with the intent to sell over 446 grams of ethylone. He also agreed that the district court would determine his criminal history category under the Sentencing Guidelines. He stipulated to a recommended sentence of 57 months "so long as the Criminal History Category [was] IV or less." If the "Criminal History Category [was] V or greater," he stipulated that his recommended sentence would be at the "low-end of the Sentencing Guidelines range determined by the Court." In addition, Kelly expressly waived his "right to appeal any sentence imposed within or below the applicable Sentencing Guideline range as determined by the Court," as well as "the manner in which the Court determined that sentence."

At sentencing, the district court adopted the Presentence Report, found a criminal history category of V, and sentenced Kelly to 70 months' imprisonment at the low end of his applicable Guidelines range. After judgment was

---

[7] The district court also denied Kelly's request for an evidentiary hearing to present expert testimony that "a substance's isomer does not necessarily have the same effects and properties as the substance itself." The court held that such a hearing was not necessary because it was sufficient, for purposes of the motion to dismiss, that Kelly agreed ethylone was a positional isomer of butylone.

entered, Kelly timely appealed the denial of his motion to dismiss the indictment and his sentence.

## III

We have jurisdiction under 28 U.S.C. § 1291. "We review the sufficiency of an indictment de novo." *United States v. Kaplan*, 836 F.3d 1199, 1216 (9th Cir. 2016). "We review de novo a district court's decision whether to dismiss a charge in an indictment based on its interpretation of a federal statute." *United States v. Olander*, 572 F.3d 764, 766 (9th Cir. 2009). We review de novo both an "agency's interpretation or application of a statute," *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1212 (9th Cir. 2008), and the constitutionality of an agency's regulation, *see Gonzalez v. Metro. Transp. Auth.*, 174 F.3d 1016, 1018 (9th Cir. 1999). And we review de novo whether a defendant has waived his appeal rights pursuant to a plea agreement. *United States v. Lightfoot*, 626 F.3d 1092, 1094 (9th Cir. 2010).

## IV

Federal Rule of Criminal Procedure 12(b) allows a defendant to file a pretrial motion to dismiss an indictment for failure to state an offense if the motion "can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B)(v). "A motion to dismiss is generally capable of determination before trial if it involves questions of law rather than fact." *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993) (quotations omitted). Because Kelly's challenges to the indictment are based on legal issues and he does not dispute that ethylone is a positional isomer of butylone, we may resolve the issues here without intruding upon the "province of the ultimate finder of fact." *Id.* (quotation omitted); *see United States v. Covington*, 395 U.S. 57, 60 (1969). In determining whether an

indictment charges a cognizable offense, we are bound by the four corners of the indictment, must accept the truth of the allegations in the indictment, and cannot consider evidence that does not appear on the face of the indictment. *United States v. Lyle*, 742 F.3d 434, 436 (9th Cir. 2014); *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996).

A

Kelly argues that the DEA did not place ethylone into Schedule I as a matter of law because §§ 811(h) and 812(b) require that the DEA name and make findings for each individual isomer it intends to temporarily schedule. He contends that the DEA's failure to do so violated the Constitution's non-delegation doctrine. Kelly's argument is a misreading of the CSA. The plain language of the statute permits the DEA to make findings for a parent substance as a basis to temporarily schedule that substance and its isomers. The DEA properly made findings for butylone and provided notice covering butylone and its isomers as required by §§ 811(h) and 812(b). In following the congressional mandate, we hold the DEA did not violate the non-delegation doctrine.

The Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., art. I, § 1. The non-delegation doctrine provides that "Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby*, 500 U.S. at 165. "It is clear that in [§ 811(h)] and [§ 812(b)] Congress has placed multiple specific restrictions on the [DEA]'s discretion to define criminal conduct." *Id.* at 167. "These restrictions satisfy the constitutional requirements of the nondelegation doctrine." *Id.*

Section 812(b) prohibits any substance from being placed into Schedule I unless the DEA finds that it has (1) a high potential for abuse, (2) no currently accepted medical use in treatment, and (3) no accepted safe use under medical supervision. § 812(b)(1). Section 811(h) requires that, to temporarily schedule a drug, the DEA must consider (4) the history and current pattern of the drug's abuse, (5) the scope, duration, and significance of the abuse, and (6) what risk, if any, the drug poses to the public health. § 811(c)(4)–(6), (h)(3). In doing so, the DEA "shall be required to consider" the drug's "actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or distribution." § 811(h)(3).

The DEA must consider these factors "with respect to each drug or other substance proposed to be controlled." § 811(c). The effect of scheduling a substance in Schedule I(c) includes:

> Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the [parent] hallucinogenic substances, or which contains any of their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation[.]

21 U.S.C. § 812, Schedule I(c). Under this section, if the required findings are made for a parent hallucinogenic substance, then the scheduling also includes its isomers. 21 U.S.C. § 812, Schedule I(c); 21 C.F.R. § 1308.11(d). Substances are temporarily scheduled under Schedule I. § 811(h)(1). As it did for butylone, if the DEA makes

findings for the parent hallucinogenic substance, that substance's isomers may be included in the emergency scheduling. Once the findings have been made, the DEA may not issue an order temporarily scheduling a drug without publishing in the Federal Register a 30-day notice of its intent "to issue such [an] order and the *grounds* upon which such order is to be issued." § 811(h)(1)(A) (emphasis added).

The DEA did not violate the non-delegation doctrine when it temporarily scheduled ethylone. The agency made specific findings as to the parent drug, butylone. For example, the Notice and Order found that the ten synthetic cathinones "can cause acute health problems leading to emergency department admissions, violent behaviors causing harm to self or others, or death." The DEA also found that "the possibility of death for individuals abusing [the ten synthetic cathinones] indicates that these substances are serious public health threats," and it provided examples of two individuals who died after ingesting butylone or a mixture containing butylone and another controlled substance. Although Kelly contends otherwise, the DEA was not required to make specific findings for every isomer of butylone. The findings for butylone are sufficient to satisfy the requirements for temporary listing under § 811(h) because under Schedule I findings regarding the parent substance are sufficient to justify the scheduling of its isomers.

Thus, by complying with §§ 811(h) and 812(b)'s "specific restrictions on [its] discretion to define criminal conduct," the DEA's temporary scheduling of ethylone did not amount to an exercise of legislative power in violation of the non-delegation doctrine. *Touby*, 500 U.S. at 167; *see also Gonzales v. Oregon*, 546 U.S. 243, 259–60 (2006)

(recognizing that the CSA gives the DEA "limited powers, to be exercised in specific ways," that "[t]o exercise [its] scheduling power, the [DEA] must follow a detailed set of procedures," and that the CSA is "specific as to the manner in which the [DEA] must exercise this authority"); *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979) ("[A]gency discretion is limited not only by substantive, statutory grants of authority, but also by the procedural requirements which assure fairness and mature consideration of rules of general application." (quotation omitted)).   The DEA properly exercised its limited powers as defined by Congress to temporarily list butylone and its isomers, including ethylone.

B

When the DEA filed the Notice and Order in the Federal Register, Kelly received fair notice that ethylone was a controlled substance.  The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "It is a basic principle of due process" that the law must provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Due process "mandate[s] that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited."  *Dunn v. United States*, 442 U.S. 100, 112 (1979); *see also Lanzetta v. State of New Jersey*, 306 U.S. 451, 453 (1939) ("All are entitled to be informed as to what the State commands or forbids.").  To that end, "the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Lanzetta*, 306 U.S. at 453 (quotation omitted).  "Congress has provided that proper publication in the Federal Register

shall act as constructive notice to all of those affected by the regulation in question." *United States v. Wilhoit*, 920 F.2d 9, 10 (9th Cir. 1990) (citing 44 U.S.C. § 1507).

Kelly had notice through the DEA's temporary scheduling of butylone and its isomers that his drug-selling conduct was forbidden. The agency fully complied with its statutory authority granted by Congress to address this emergency prompted by synthetic compounds like Ecstasy, which endanger the public. Here, the DEA's Order stated that "[a]s a result of this order, the . . . criminal sanctions applicable to schedule I controlled substances will be imposed on persons who handle (manufacture, distribute, import, export, engage in research, conduct instructional activities, and possess) . . . [the ten] synthetic cathinones." Further, under the heading "Criminal Liability," it warned that "[a]ny activity involving [the ten synthetic cathinones] not authorized by, or in violation of the CSA, occurring as of March 7, 2014, is unlawful, and may subject the person to . . . criminal sanctions." More specifically, the Order advised that "[b]utylone, its optical, positional, and geometric isomers, salts and salts of isomers," were temporarily scheduled under Schedule I. The DEA's Notice contained substantially similar language.

Through the Federal Register, Kelly had public notice that distributing Ecstasy in the form of ethylone could result in criminal sanctions. *See Wilhoit*, 920 F.2d at 10.

C

The rule of lenity does not apply to Kelly's case. "The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion). It derives from the fundamental principle that "no

man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954).

The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and quotations omitted). "In these circumstances—where text, structure, and history fail to establish that the Government's position is *unambiguously* correct—we apply the rule of lenity and resolve the ambiguity in [the defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994); *People v. Materne*, 72 F.3d 103, 106 (9th Cir. 1995) ("Only where the defendant's interpretation is unreasonable does the rule of lenity not apply.").

The text, history and purpose of the CSA paint a clear picture that Congress intended to empower the DEA to temporarily schedule isomers. The plain language of §§ 811 and 812 discusses isomers and their scheduling in conjunction with the parent substances. The CSA defines an isomer for Schedule I(c) under § 802(14). The regulations further clarify what an isomer is under 21 C.F.R. § 1300.01(b). These definitions refer to Schedule I generally and do not purport to limit isomers to the DEA's permanent scheduling authority. In addition, when the DEA schedules a parent substance under Schedule I(c), unless otherwise prohibited, that scheduling also includes its isomers. § 812 Schedule I(c). The plain language of the CSA clearly contemplates the scheduling of isomers under both the temporary and permanent scheduling authority.

History also demonstrates that isomers can be temporarily listed. In 2000 Congress ordered the DEA to

temporarily list the performance enhancing drug "GHB" "together with its . . . isomers" in the same way that the DEA always does under § 811(h), confirming its approval of the DEA's actions. *See* Pub. L. No. 106-172, § 3(a), 114 Stat. 7, 8 (Feb. 18, 2000). Dozens of drugs have been temporarily listed with their isomers since 1984, and 16 are listed now. 21 C.F.R. § 1308.11(h).

Finally, the purpose of the DEA's temporary scheduling power is to stop dangerous designer drugs as they are developed. The 1984 amendments giving the DEA the temporary scheduling power clarified the definition of "isomer" to avoid the "isomer defense"—when clever drug designers switch an isomer in an effort to avoid prosecution. S. Rep. No. 98-225, at 263 (1983). Congress sought to avoid "clandestine manufacturers [attempting] to circumvent the law by manufacturing positional and geometric isomers of hallucinogens in schedule I." *Id.* Congress unambiguously granted the temporary scheduling authority to prohibit conduct, like Kelly's, of distributing dangerous substances that have yet to be permanently listed. If the DEA could not temporarily schedule isomers of parent substances, the entire emergency scheduling scheme would collapse. The DEA would be in a never-ending inquiry to temporarily schedule every single isomer and make findings on every chemical variation of a dangerous drug. It is highly unlikely the agency could keep up with the pace of clandestine drug manufacturers.

The plain language, history, and purpose of temporary scheduling authority make congressional intent clear. The

rule of lenity only applies to "ambiguous criminal laws." *Santos*, 553 U.S. at 514.  There is no ambiguity here.[8]

## D

The DEA's decision to temporarily schedule ethylone was authorized pursuant to its temporary scheduling power and a clear directive from Congress.  The district court properly found the DEA's temporary scheduling authorized at *Chevron* step one.

*Chevron* sets forth a two-step test for reviewing an agency's interpretation of a federal statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44 (1984).  Under *Chevron* step one, the court must determine "whether Congress has directly spoken to the precise question at issue."  *Id.* at 842.  "If the intent of Congress is clear, that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842–43.  However, "if the statute is silent or ambiguous with respect to the specific issue," the court must proceed to the second *Chevron* step.  *Id.* at 843.  Under *Chevron* step two, the court must uphold the agency's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute."  *Id.* at 844.

The plain language of the CSA evinces Congress' intent to permit the DEA to temporarily schedule a parent substance and its isomers, such as butylone and ethylone. First, under the permanent scheduling authority, if the drug

---

[8] Kelly argues the rule of lenity trumps the deference we give to the agency under *Chevron*.  *Mujahid v. Daniels*, 413 F.3d 991, 999 (9th Cir. 2005) (the Supreme Court has not "address[ed] when the rule of lenity takes priority over *Chevron* deference.").  As we find that the rule of lenity does not apply, we do not address this argument.

is in a subcategory of Schedule I (*a* through *c*) then the DEA is only required to make findings regarding the "parent" substance and then permits the scheduling of the isomers of that parent. § 812 Schedule I(c).  In conjunction with this authority, the statute defines isomers:  "[a]s used in schedule I(c), the term 'isomer' means any optical, positional, or geometric isomer."  21 U.S.C. § 802(14).  In defining and discussing isomers the CSA does not confine them to permanent scheduling, rather this applies to the DEA's overall scheduling authority, permanent and temporary. Congress was contemplating the scheduling of isomers throughout the CSA, not only in their permanent scheduling.

The temporary scheduling authority is broader and more efficient than permanent scheduling.  The temporary authority is intended to permit the DEA to react quickly to new drugs on the market that present a threat to human health.  S. Rep. No. 98-225, at 263–64 (1983).  In order to properly address this threat, Congress gave the DEA the power to schedule threatening substances more efficiently, but only for a two-year period.  § 811(h)(2).  The agency need only make three findings in order to temporarily schedule a substance, which makes it less burdensome to quickly schedule dangerous substances.  § 811(h)(3). Congress granted this broad authority to schedule drugs and their isomers to expedite the scheduling process to avoid limiting law enforcement actions against traffickers and creating a "serious health problem."  S. Rep. No. 98-225, at 264 (1983).

The intent of Congress is clear that the DEA has authority to temporarily schedule a parent substance and its isomers.  Our inquiry ends at the first step of *Chevron.* 467 U.S. at 842.  The district court properly accorded *Chevron* deference to the agency interpretation.

E

Kelly's plea agreement clearly and unambiguously waived his right to appeal the very sentencing issue he raises here. Kelly does not contend that his waiver of this right was unknowing or involuntary. *See United States v. Speelman*, 431 F.3d 1226, 1229 (9th Cir. 2005); *see also United States v. Arzate-Nunez*, 18 F.3d 730, 737 (9th Cir. 1994) ("A defendant who enters a conditional guilty plea . . . must state in writing any issues he wishes to reserve for appeal and may lose the right to appeal issues not so expressly reserved.").[9] As Kelly fails to argue that his unambiguous waiver of his right to appeal was involuntary, the plea agreement controls on this issue and we hold his sentencing challenge was waived.

V

We affirm the district court's denial of Kelly's motion to dismiss the indictment; affirm Kelly's conviction; and dismiss Kelly's challenge to the district court's criminal history category calculation and resulting 70-month sentence.

**AFFIRMED in part, DISMISSED in part.**

---

[9] Kelly also argues, for the first time in his reply brief, that he is released from his appeal waiver because the Government breached the plea agreement. We decline to consider this argument because Kelly waived it by failing to raise it in his opening brief. *See United States v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1020 (9th Cir. 1999).