**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3676-17

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

LOUIS V. GREEN, a/k/a LOU,
ROBERT HAWKINS, and
SAMUEL L. JAMISON,

      Defendant-Appellant.

_____

> Argued October 15, 2020 – Decided October 8, 2021
>
> Before Judges Ostrer, Accurso, and Vernoia.
>
> On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 15-06-0637.
>
> Emma R. Moore, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Emma R. Moore, of counsel and on the briefs).
>
> Amanda G. Schwartz, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal,

Attorney General, attorney; Amanda G. Schwartz, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, P.J.A.D.

After bifurcated trials, a jury found Louis V. Green guilty of two counts of possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a)(1), and two counts of certain persons not to possess a weapon, N.J.S.A. 2C:39-7(b)(1). One drug-related count involved ethylone; the other alprazolam. The jury could not reach a verdict on a count charging possession of ethylone with intent to distribute. N.J.S.A. 2C:35-5(b)(4). But Green later pleaded guilty to that count to resolve other pending charges. On appeal, Green principally contends his ethylone-related convictions should be reversed because the law that allegedly outlaws ethylone possession is void for vagueness and unconstitutionally delegates legislative power. He also challenges his certain persons convictions on the grounds the court did not confirm that his stipulation to a key element of the offense was voluntary and knowing, and the court failed to orally deliver substantial sections of the final jury instructions.

We conclude the law as it existed when Green was charged was unconstitutionally vague, requiring reversal of his ethylone-related convictions. And we agree that the failure to determine that Green's stipulation was knowing

A-3676-17

and voluntary requires reversal of his certain persons convictions.  We affirm his conviction of possession of alprazolam.

## I.

In the trial of the drug-related charges, Police Officer Michael Bennett testified that he arrested Green after responding to a dispatch report of a domestic dispute.  Through an open front door, Bennett saw Green — whom he recognized from other interactions — run up the stairs, ignoring his calls to return.  Bennett spotted drug paraphernalia in plain view on a table and a man seated nearby.  Bennett ordered the man to leave the house, and Bennett then entered to pursue Green.  Bennett found him and his wife hiding in a closet.  After they left the closet, Bennett observed and seized a rifle case that contained a pump action shotgun with seven shells.  In defendant's bedroom, other officers found a bag of marijuana and a bag that contained "several large chunks of . . . a tan brownish crystalized substance" suspected to be MDMA.[1]  Pursuant to a later-obtained warrant, officers ultimately seized those items, along with another bag of suspected MDMA, a packet of several pills, digital scales, and a second

---

[1]  MDMA or methylenedioxymethamphetamine, is a CDS commonly known by the street names ecstasy or molly.  See In re Kollman, 210 N.J. 557, 563 (2012).

shotgun.  They also seized a small baggie of suspected MDMA from the man who sat by the door.

A forensic scientist from the Burlington County Forensic Laboratory, Kathleen Beyer, testified that her analysis — using a gas chromatograph mass spectrometer — confirmed that the pills were alprazolam, also known as Xanax, and the three bags of suspected MDMA, the "light brown, tannish substance," actually was ethylone.  She said ethylone was a "positional isomer of butylone," without defining the term "positional isomer" (an issue we address below).  The ethylone in the three bags weighed 40.76 grams, 62.7 grams, and .54 grams.

Burlington County Prosecutor's Office Lieutenant Daniel Leon, testifying as "an expert in the field of narcotics, specifically the manufacture and distribution" of CDS, opined without objection that ethylone was a CDS and a "party drug."  He described its typical dosage, retail price, modes of use, and its effects.  He concluded that the 104 ounces of ethylone contained between 520 to 1,040 individual doses with a retail value of $20 to $25 per dose.  Asked to elaborate on the other items found in the residence, Leon testified that police seized the scales, other narcotics, two rifles, and $140.  Then, evidently referring to the simple possession charges, he added, "based on the weights and other factors I determined that they were correctly charged, and didn't become a factor

4

in my determination today, the reason why I'm here today," which was to opine about the possession-with-intent-to-distribute count. On cross-examination, defense counsel tried to challenge Leon's opinion that casual users possess only a few packets at a time by suggesting that a casual user may wish to stock up on a drug to avoid the risk of repeatedly purchasing drugs. On redirect, the prosecutor asked Leon if he ever "reviewed a case and found there was not evidence to support a charge of possession with intent to distribute." Over the defense's objection, the court allowed the witness to answer that he had. Leon also testified that he was familiar with cases in which police seized a large amount of drugs without a large amount of money.

Regarding the possession-with-intent-to-distribute charge, Officer Bennett (who was not qualified as an expert witness) testified that the small bag of drugs seized from the man by the door was "the amount that normally [one] would find on a person who uses the substance themselves, not a larger quantity like someone who may be distributing it."

Green called one witness, his grandmother. She and her now-deceased husband owned the home where defendant had been living. She initially testified that her husband owned one of the two shotguns recovered from the home. But she later agreed that her husband left both guns at the home. She

5

said she and her husband left them there, along with other personal property, when they vacated the house a couple of years earlier.

In his final charge to the jury, the judge instructed that "[e]thylone is a dangerous substance prohibited by statute." The jury's task was to determine if the material seized and in evidence was ethylone; whether defendant possessed it; and, regarding the possession-with-intent-to-distribute count, whether he possessed it with the intent to distribute it and acted knowingly or purposely in doing so.

As noted, the jury found defendant guilty of possessing ethylone and alprazolam but did not reach a verdict on the possession-of-ethylone-with-intent-to-distribute charge.

Immediately following the drug trial, the court conducted the trial of the two certain persons counts. The parties stipulated defendant had committed a predicate offense as required by the statute (which we discuss in greater detail below). The only witness was a law enforcement officer who discussed one shotgun's operability. The jury found defendant guilty of both counts.

Thereafter, Green pleaded guilty to the possession-with-intent-to-distribute count; in return, the State agreed to dismiss a separate indictment and another unindicted matter, and to recommend a sentence of ten years with a five-

A-3676-17

year period of parole ineligibility, to run concurrent to the remaining counts on the indictment.

In accord with the agreement, the court sentenced defendant to ten years with five years of parole ineligibility on the possession-with-intent-to-distribute count, seven years with five years of parole ineligibility on each certain persons count, and four years flat on each simple possession count, with all the sentences running concurrently.

## II.

Defendant raises the following points on appeal:

> POINT I
>
> ETHYLONE IS CRIMINALIZED BASED ON A COMPLEX SCHEME WHICH AUTOMATICALLY INCORPORATES FEDERAL ADMINISTRATIVE RULES INTO NEW JERSEY CRIMINAL LAW. BECAUSE THIS SCHEME UNCONSTI- TUTIONALLY DELEGATES LEGISLATIVE AUTHORITY AND FAILS TO GIVE CONSTITUTIONALLY REQUIRED NOTICE, MR. GREEN'S ETHYLONE-RELATED CHARGES MUST BE OVERTURNED. (Not raised below).
>
> A. New Jersey's Drug Scheduling Laws Unconstitutionally Surrender State Legislative Power to Federal Agencies.
>
> i. The State's Responsibility to Make Law is Non-Delegable.

A-3676-17

ii. [N.J.S.A.] 24:21-3 and the Corresponding Administrative Code Unconstitutionally Grant Federal Agencies the Power to Make State Law.

B. The Legal Web Which Purports to Criminalize Ethylone is Unconstitutionally Vague as Applied in This Case and Fails to Give Public Notice of Its Requirements. Because Ethylone Is Incorporated Into New Jersey Law By Oblique Reference, Prosecution for Its Possession Violates N.J. Const. Art. I., Par. 1, and U.S. Const. Amend. XIV.

i. New Jersey's Statutory and Regulatory Scheme Does Not Put Citizens on Notice that Ethylone is a Controlled Substance.

ii. Federal Law On Its Own Does Not Give Citizens Sufficient Notice. The Multi-Layered State-Federal Scheme Therefore Fails Even More Decisively to Pass Constitutional Muster.

POINT II

THE STATE'S WITNESSES OPINED ON MR. GREEN'S INTENT AND THE LEGAL SUFFICIENCY OF THE STATE'S EVIDENCE, QUESTIONS RESERVED STRICTLY FOR THE JURY, IN VIOLATION OF THE HOLDINGS IN STATE V. CAIN AND STATE V. SIMMS. (Partially raised below[]).

POINT III

A DEFENDANT WHO STIPULATES THAT HE HAS BEEN PREVIOUSLY CONVICTED OF A "PREDICATE OFFENSE" AS DEFINED BY [N.J.S.A.] 2C:39-7(b)(1) WAIVES THE CONSTITUTIONAL RIGHT TO HAVE EVERY

8

ELEMENT OF EVERY CHARGE AGAINST HIM PROVEN BEYOND A REASONABLE DOUBT AND THE RIGHT NOT TO INCRIMINATE HIMSELF. BECAUSE SUCH A WAIVER MUST BE KNOWING AND VOLUNTARY AND THERE IS NO INDICATION THAT IT WAS, MR. GREEN WAS DEPRIVED OF DUE PROCESS, NECESSITATING REVERSAL OF THE CERTAIN-PERSONS CHARGE. (Not raised below).

POINT IV

THE INSTRUCTION GIVEN PRIOR TO THE JURY'S DELIBERATION ON THE CERTAIN-PERSONS CHARGES OMITTED KEY INSTRUCTIONS INCLUDING THE CONCEPTS OF REASONABLE DOUBT, BURDENS OF PROOF, PRESUMPTIONS OF INNOCENCE, AND MERE PRESENCE. THE JUDGE'S FAILURE TO GIVE A COMPLETE INSTRUCTION VIOLATED MR. GREEN'S RIGHT TO A FAIR TRIAL AND REQUIRES REVERSAL. (Not raised below).

## III.

Defendant contends New Jersey's drug scheduling regime unconstitutionally delegates legislative power, and the law outlawing ethylone was unconstitutionally vague.

## A.

As a threshold matter, we reject the State's contention that Green waived his constitutional arguments by failing to raise them before the trial court and by pleading guilty to possession with intent to distribute.

9

Defendant's guilty plea does not prevent him from contesting the statute's constitutionality on direct appeal. As the United States Supreme Court recently explained, "a guilty plea by itself" does not "bar[] a federal criminal defendant from challenging the constitutionality of the statute of conviction on direct appeal," at least where the constitutional claims "do not contradict the terms of the indictment or the written plea agreement" and do not "focus upon case-related constitutional defects" that could have been cured if the claims were raised earlier. Class v. United States, 138 S. Ct. 798, 803-05 (2018). Thus, in Class, the defendant, who pleaded guilty to possessing a firearm on U.S. Capitol Grounds, was permitted to argue on appeal "that the statute violate[d] the Second Amendment and the Due Process Clause because it fails to give fair notice of which areas fall within the Capitol Grounds where firearms are banned." Id. at 802.

Here, Green similarly raises a fair notice argument that does not contradict the facts alleged in the indictment. He admitted in his plea colloquy that he possessed over an ounce of ethylone and he intended to share with it others. In doing so, he did not waive or forfeit the legal argument that those facts do not constitute a crime because of the law's lack of notice and the unlawful delegation of legislative power. "[I]f the facts alleged and admitted do not constitute a

10

crime . . . the defendant is entitled to be discharged." Id. at 804 (quoting Commonwealth v. Hinds, 101 Mass. 209, 210 (1869)).

Nor shall we decline to reach Green's constitutional arguments because he did not raise them to the trial court. Although we typically do not address claims raised for the first time on appeal, we will do so when "the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest." State v. Robinson, 200 N.J. 1, 20 (2009) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)). We also "retain the inherent authority to 'notice plain error not brought to the attention of the trial court[,]' provided it is 'in the interests of justice' to do so." Ibid. (alteration in original) (quoting R. 2:10-2). Here, we are not impeded by the failure "to create a complete record," because no factual record is needed to address Green's legal arguments. See id. at 20-21 (stating that the "appellate court should stay its hands and forego grappling with an untimely raised issue" where the factual record was undeveloped). Rather we are confronted with an issue of great public interest — the constitutionality of a criminal law.[2] We shall consider it.

---

[2] Green also argues that we must reach his constitutional arguments because he challenges the court's subject matter jurisdiction, and such challenges are unwaivable. Although we agree that "subject matter jurisdiction cannot be conferred by waiver," Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 66

B.

We begin with Green's claim of unlawful delegation.

To analyze Green's argument, we must first describe the State's system of designating a CDS. New Jersey's criminal drug law delegates authority to the Director of the Division of Consumer Affairs (the Director) to determine what substances it shall be unlawful to possess, in addition to those expressly identified in the Criminal Code (like heroin, N.J.S.A. 2C:35-5(b)(1)) and in the New Jersey Controlled Dangerous Substances Act (CDSA), N.J.S.A. 24:21-1 to -56. The criminal law does so by prohibiting possession of a CDS classified in one of five schedules, see N.J.S.A. 2C:35-5(b)(13), (14), and by defining

_____

(1978), we need not reach Green's more debatable proposition that "the constitutionality of the statute of conviction is a question of subject-matter jurisdiction." Compare Ex parte Yarbrough, 110 U.S. 651, 654 (1884) ("If the law which defines the offense and prescribes its punishment is void, the court was without jurisdiction . . . .") and Ex parte Siebold, 100 U.S. 371, 377 (1879) (considering writ of habeas corpus, stating, "if the laws are unconstitutional and void, the Circuit Court acquired no jurisdiction of the causes"), with United States v. Cotton, 535 U.S. 625, 630 (2002) (stating that "defects in an indictment do not deprive a court of its power to adjudicate a case," and noting that the Court in Lamar v. United States, 240 U.S. 60, 64 (1916), "rejected the claim that 'the court had no jurisdiction because the indictment does not charge a crime against the United States'") and United States v. Williams, 341 U.S. 58, 68-69 (1951) ("Though the trial court or an appellate court may conclude that the statute is wholly unconstitutional, or that the facts stated in the indictment do not constitute a crime or are not proven, it has proceeded with jurisdiction . . . .").

"Schedules I, II, III, IV, and V" to mean the "schedules set forth in [N.J.S.A. 24:21-5 to -8.1] and as modified by any regulations issued by the Director of the Division of Consumer Affairs . . . pursuant to the [D]irector's authority as provided in [N.J.S.A. 24:21-3]," N.J.S.A. 2C:35-2.

Under N.J.S.A. 24:21-3, the Director may affirmatively add a substance to a schedule, or the Director may allow substances to be added by withholding objection to, and thereby adopting, federal classification of a substance. As we explained in State v. Nicolas, 461 N.J. Super. 207, 211 (App. Div. 2019), "N.J.S.A. 24:21-3(a) permits the Director to control a substance after considering eight factors concerning the substance's potential for abuse, the scientific evidence and knowledge of the substance's effects, and the risk to public health." The eight factors are:

> (1) [The substance's] actual or relative potential for abuse;
>
> (2) Scientific evidence of its pharmacological effect, if known;
>
> (3) State of current scientific knowledge regarding the substance;
>
> (4) Its history and current pattern of abuse;
>
> (5) The scope, duration, and significance of abuse;
>
> (6) What, if any, risk there is to the public health;

13

(7) Its psychic or physiological dependence liability; and

(8) Whether the substance is an immediate precursor of a substance already controlled under this article.

[N.J.S.A. 24:21-3(a).]

But substances may also be added as a result of federal action. "If any substance is designated, rescheduled or deleted as a controlled dangerous substance under federal law and notice thereof is given to the [D]irector, the [D]irector shall similarly control the substance . . . after the expiration of [thirty] days from the publication in the Federal Register . . . ." N.J.S.A. 24:21-3(c); Nicolas, 461 N.J. Super. at 211-12. "Should the Director 'object' to the federal government's 'inclusion, rescheduling, or deletion[,] . . . the [D]irector shall cause to be published in the New Jersey Register and made public the reasons for his objection and shall afford all interested parties an opportunity to be heard.'" Nicolas, 461 N.J. Super. at 212 (first alteration in original) (quoting N.J.S.A. 24:21-3(c)). After completing the hearing, the Director must then decide whether the substance shall be added. N.J.S.A. 24:21-3(c). The Director also retains the authority at a later date to remove a substance added by dint of federal action. Kadonsky v. Lee, 452 N.J. Super. 198, 210-11 (App. Div. 2017).

14

In this case, ethylone allegedly became a CDS under State law as a result of federal action without the Director's objection, although the federal designation did not identify ethylone itself. Rather, in March 2014, the Drug Enforcement Administration (DEA) temporarily added "butylone" to Schedule I, along with butylone's "optical, positional, and geometric isomers, salts and salts of isomers." Schedules of Controlled Substances: Temporary Placement of 10 Synthetic Cathinones Into Schedule I, 79 Fed. Reg. 12,938, 12,942-43 (Mar. 7, 2014); see United States v. Phifer, 909 F.3d 372, 375-76 (11th Cir. 2018) (describing the process by which butylone was added). The temporary designation was in place when Green was arrested in January 2015.[3] The State maintains that ethylone is in fact a "positional isomer" of butylone (a contention we discuss in greater detail below).

Green's claim of unlawful delegation of legislative power fails because the State's scheme falls within the Legislature's broad authority to delegate its power. "The New Jersey Constitution vests lawmaking power in the

---

[3] A temporarily scheduled substance remains on the schedule for two years. See 21 U.S.C. § 811(h)(2). Butylone and its identified isomers and salts were added to the permanent Schedule I list of hallucinogenic substances in 2017. Schedule of Controlled Substances: Placement of 10 Synthetic Cathinones Into Schedule I, 82 Fed. Reg. 12,171-77 (Mar. 1, 2017). Ethylone by name was added to the list in 2020. Listing of Ethylone in Schedule I of Controlled Dangerous Substances, 85 Fed. Reg. 34,967-69 (June 8, 2020).

Legislature." Perth Amboy Bd. of Educ. v. Christie, 413 N.J. Super. 590, 600 (App. Div. 2010) (citing N.J. Const. art. IV, § 1, ¶ 1). But "[t]he Legislature may delegate its authority as long as it provides standards to guide the discretionary exercise of the delegated power," and the delegation does not "impair[] the 'essential integrity' of the Legislature." Worthington v. Fauver, 88 N.J. 183, 207-08 (1982) (quoting In re Investigation Regarding Ringwood Fact Finding Comm., 65 N.J. 512, 527 (1974) (Pashman, J., concurring and dissenting in part)).

Because those "standards may be general," the Court has "frequently . . . upheld statutes delegating broad powers in furtherance of the public health, safety and welfare" of the State. Id. at 209 (concluding the Disaster Control Act, N.J.S.A. App. A:9-30 to -63, did not unlawfully delegate legislative authority by granting "to the executive branch the authority to issue emergency orders to protect the public health, safety and welfare"). In particular, "[w]hen it establishes an administrative agency, the Legislature 'delegate[s] the primary authority of implementing policy in a specialized area to governmental bodies with the staff, resources, and expertise to understand and solve those specialized problems.'" Commc'ns Workers of Am., AFL-CIO v. N.J. Civ. Serv. Comm'n, 234 N.J. 483, 514-15 (2018) (alteration in original)

16

(quoting Bergen Pines Cnty. Hosp. v. N.J. Dep't of Hum. Servs., 96 N.J. 456, 474 (1984)). "The grant of authority to an administrative agency is to be liberally construed to enable the agency to accomplish the Legislature's goals." Muise v. GPU, Inc., 332 N.J. Super. 140, 158 (App. Div. 2000) (quoting Gloucester Cnty. Welfare Bd. v. N.J. Civ. Serv. Comm'n, 93 N.J. 384, 390 (1983)).

The State's CDS scheduling scheme does not impair the Legislature's integrity by authorizing the Director, in the first instance, to determine whether to adopt or not, a federal designation. Nor does the Director's decision lack standards. We recognize that the CDSA identifies eight factors only in N.J.S.A. 24:21-3(a), pertaining to the Director's decision to add a substance on his or her own initiative, and not in N.J.S.A. 24:21-3(c), pertaining to the adoption by non-objection of federally-designated substances. Those same eight factors guide the federal decision to permanently designate a substance. See 21 U.S.C. § 811(c) (including the eight factors). But to schedule a substance in Schedule I on a temporary basis, the Attorney General, (who has delegated that authority to the DEA, see Phifer, 909 F.3d at 375), must find doing so "is necessary to avoid an imminent hazard to the public safety," 21 U.S.C. § 811(h)(1), after considering only factors four, five, and six — "history and current pattern of

abuse"; "scope, duration, and significance of abuse"; and any "risk . . . to the public health," 21 U.S.C. § 811(h)(3). Therefore, we conclude that the Director's decision to object or not to a federal designation depends on whether the Director agrees or not that an imminent public safety hazard justifies the designation in light of those three factors. In short, the decision to object is guided by the same factors that guide the federal designation.

The Director's power to object to federal action distinguishes this case from one of wholesale incorporation of federal law, which may constitute an unlawful delegation of legislative authority. "A statute . . . could be passed to conform to federal regulations, but the National Code cannot be made law by reference; in other words, our Legislature could follow the Federal Government's policy, but it, itself, must enact the law, not adopt it." Wilentz v. Sears, Roebuck & Co., 12 N.J. Misc. 531, 532 (Ch. 1934). And while the statute here no doubt makes federal law the default, the Director is free to object and diverge from the federal schedules. Put another way, nothing in the current scheme "requires that our Code be consistent with the Federal Code." Ibid.

And, since the state scheduling system need not follow the federal system, defendant's assertion that the ultimate decision-makers are beyond the reach of, and thus not answerable to, New Jersey voters is wide of the mark. If the federal

18

government schedules a substance and the Director fails to object, the substance becomes illegal to possess at the state level. If New Jersey citizens do not agree with that decision, they can campaign to vote the Governor out of office, because the Governor appoints the Attorney General, N.J.S.A. 52:17B-2, and the Attorney General appoints the Director, N.J.S.A. 52:17B-120.

In sum, we reject Green's assertion that New Jersey's statutory regime of scheduling CDS is an unconstitutional delegation of the Legislature's power.

## C.

We next consider Green's void-for-vagueness argument. We conclude that vagueness of the term "positional isomer" dooms the State's prosecution for the ethylone-related counts. Even if that were not so, the court improperly directed a verdict on an element of the possessory offenses by instructing the jury that ethylone was a CDS, rather than directing the jury to decide if ethylone is a positional isomer of butylone. Likewise, defendant's plea colloquy fell short of providing a factual basis for conviction of possession with intent to distribute, by omitting an admission that ethylone is a positional isomer of butylone.

"The vagueness doctrine is compelled by notions of due process," as it "assures not only fair warning or notice, but also guards against arbitrary or unpredictable law enforcement." State v. Riley, 412 N.J. Super. 162, 184, 186

19

(Law Div. 2009). "Vague criminal statutes violate due process because they fail to warn and notify the public that certain conduct could carry 'criminal or quasi-criminal' liability." In re Civ. Commitment of J.M.B., 197 N.J. 563, 599 (2009) (quoting State v. Hoffman, 149 N.J. 564, 581 (1997)). "[F]undamental principles of due process . . . mandate that no individual be forced to speculate, at peril of indictment, whether his [or her] conduct is prohibited." Dunn v. United States, 442 U.S. 100, 112 (1979); see also State v. Afanador, 134 N.J. 162, 170 (1993) ("A criminal statute violates due process if persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" (quoting Connally v. Gen. Constr. Co., 269 U.S. 384, 391 (1926))).

That is why "to ensure that a legislature speaks with special clarity when marking the boundaries of criminal conduct, courts must decline to impose punishment for actions that are not 'plainly and unmistakably' proscribed." Dunn, 442 U.S. at 112-13 (quoting United States v. Gradwell, 243 U.S. 476, 485 (1917)). "The degree of vagueness that the Constitution tolerates . . . depend[s] in part on the nature of the enactment." Afanador, 134 N.J. at 170 (quoting Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., 455 U.S. 489, 498 (1982)). Thus, "the severe nature of the penalty" must be considered. Ibid. "[A]s a sort of

'junior version of the vagueness doctrine,' the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." United States v. Lanier, 520 U.S. 259, 266 (1997) (quoting H. Packer, The Limits of the Criminal Sanction 95 (1968)). "[T]he touchstone is whether the statute, either standing alone or as [judicially] construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. at 267.

Green contends the "legal web that purports to criminalize ethylone" fails to provide citizens of the State sufficient notice, thus rendering it unconstitutionally vague. Green focuses on the failure to identify ethylone in federal or state statute or regulation. As we have noted, the federal DEA temporarily added butylone and certain isomers and salts of butylone to the federal Schedule I; because the Director did not object, butylone and certain isomers and salts of butylone were "similarly control[led]," N.J.S.A. 24:21-3(c), under New Jersey law; and the State maintains that ethylone is therefore controlled because it is a positional isomer of butylone.

In Nicolas, we rejected the argument that a federally-designated substance was not controlled under New Jersey law until the Director updated the New Jersey schedule. 461 N.J. Super. at 212-13. Publication in the Federal Register

provides sufficient notice that, absent the Director's public objection, a substance is also controlled in New Jersey. Cf. United States v. Kelly, 874 F.3d 1037, 1049 (9th Cir. 2017) (stating that "[t]hrough the Federal Register," the defendant "had public notice that distributing . . . ethylone could result in criminal sanctions"); State v. Metcalf, 168 N.J. Super. 375, 379-80 (App. Div. 1979) (stating the publication in the New Jersey Register, before publication in the New Jersey Administrative Code, provided sufficient notice). We also do not agree that omitting ethylone by name in and of itself renders the statute unconstitutionally vague as it relates to prosecuting Green for possessing it. See Kelly, 874 F.3d at 1049 (stating that reference to isomers of a scheduled substance satisfies due process notice).

The problem is that "positional isomer" — the descriptor that the State contends sweeps in ethylone — is not clearly defined.[4] And, for the relevant time-period, ethylone is a CDS only if it is deemed a "positional isomer" of butylone; the DEA temporarily designated only butylone by name, and New Jersey controlled it similarly. As one federal court has noted, under one

---

[4] The defendant in Kelly did not dispute that ethylone was a positional isomer of butylone. 874 F.3d at 1045. Therefore, the court did not address the adequacy of the "positional isomer" definition.

textbook definition of "positional isomer," ethylone's chemical structure is not a "positional isomer" of butylone. See Phifer, 909 F.3d at 380-81.[5] Under that definition, "positional isomers have the same carbon skeleton . . . and the same functional groups . . . , but . . . the functional group is attached to the carbon skeleton at a different position." Id. at 380. Since butylone and ethylone do not have the same carbon skeleton under that definition, ethylone would not qualify as a positional isomer of butylone. Id. at 380-81.

The DEA has acknowledged that "[t]he term 'positional isomer' . . . is not universally defined, and, therefore, is subject to scientific interpretation." Definition of "Positional Isomer" as It Pertains to the Control of Schedule I Controlled Substances, 72 Fed. Reg. 67,850 (Dec. 3, 2007). To "reduce any potential confusion or inconsistencies," id. at 67,851, and to "ensure that consistent criteria are utilized," id. at 67,850, the DEA adopted its own definition of "positional isomer":

> As used in [21 C.F.R.] § 1308.11(d) of this chapter, the term "positional isomer" means any substance possessing the same molecular formula and core structure and having the same functional group(s) and/or substituents(s) as those found in the respective

---

[5] The court in Phifer included a primer on isomers, including particularly positional isomers, to demonstrate the similarities and differences between butylone and ethylone. 909 F.3d at 377-79. We cannot improve upon the court's illuminating discussion and refer our readers there.

schedule I hallucinogen, attached at any position(s) on the core structure, but in such manner that no new chemical functionalities are created and no existing chemical functionalities are destroyed relative to the respective schedule I hallucinogen.

[Id. at 67,852 (codified at 21 C.F.R. § 1300.01(b)).]

Evidently, according to that definition, ethylone would qualify as a "positional isomer" of butylone. See Phifer, 909 F.3d at 383.

But the DEA expressly defined "positional isomer" only "as used" in section 1308.11(d), which is the subsection of the regulations pertaining to permanently scheduled hallucinogenic substances; the DEA did not define "positional isomer" "as used" in section 1308.11(h), the subsection pertaining to temporarily scheduled substances, and only section 1308.11(h) included butylone and its positional isomers when Green was arrested. Subsection (d) lists numerous hallucinogenic substances and any substance "which contains any" of the hallucinogenic substance's "salts, isomers, and salts of isomers . . . [and] (for purposes of this paragraph only, the term 'isomer' includes the optical, position[al] and geometric isomers)." Subsection (h) refers to the "[t]emporary listing of substances subject to emergency scheduling," and, at the relevant time, included butylone and its "optical, positional, and geometric isomers, salts and salts of isomers." Compare 21 C.F.R. § 1308.11(d) with 21

24

C.F.R. § 1308.11(h); see also Schedules of Controlled Substances: Temporary Placement of 10 Synthetic Cathinones Into Schedule I, 79 Fed. Reg. at 12,942-43. Notably, subsection (h) is not limited to hallucinogenic substances.

By its plain meaning, the term "as used in" limits the application of a statutory definition to the section referenced and excludes applying the definition to other sections. See People v. Leal, 94 P.3d 1071, 1076 (Cal. 2004) (noting that defining a term "[a]s used in this section" pertaining to certain rape offenses "belie[d] any legislative intent to apply the definition . . . to any other sexual offenses"); Am. Tel. & Tel. Co. v. Mich. Emp. Sec. Comm'n, 136 N.W.2d 889, 891 (Mich. 1965) (stating that by including "the admonition 'as used in this section,'" the legislature "obligate[d]" the court "to respect the definition specified in the statute").

Therefore, we conclude that "positional isomer" as used in the temporary listing of butylone under subsection (h) is undefined. "Absent any explicit indications of special meanings, the words used in a statute carry their ordinary and well-understood meanings." Afanador, 134 N.J. at 171. But, as the DEA itself acknowledged, the meaning of "positional isomer" is "subject to scientific interpretation," "not universally defined," and subject to "potential confusion or

25                                                        A-3676-17

inconsistencies."[6] Definition of "Positional Isomer" as It Pertains to the Control of Schedule I Controlled Substances, 72 Fed. Reg. at 67,850-51. Such a debatable and unsettled term cannot, consistent with due process, trigger criminal sanctions, because a person of ordinary intelligence — even one with chemical training — would have to guess whether the regulation, and, thereby, the criminal code, encompassed ethylone as a positional isomer of butylone.

The State's arguments to the contrary are unavailing. The State relies on the title of the DEA's rulemaking, "Definition of 'Positional Isomer' as It Pertains to the Control of Schedule I Controlled Substances," 72 Fed. Reg. at 67,850, to support its view that the definition applies to all substances controlled under Schedule I, whether permanently or temporarily designated. But the regulation's plain language reflects a narrower focus; that is, to apply the definition to a subset of Schedule I substances — those designated as a hallucinogen under 1308.11(d), see Definition of "Positional Isomer" as It Pertains to the Control of Schedule I Controlled Substances, 71 Fed. Reg. 30,097 (May 25, 2006)

_____

[6] The DEA previously implied that "positional isomer" was ambiguous if not expressly defined. See also Definition of Positional Isomer as It Pertains to the Control of Schedule I Controlled Substances, 70 Fed. Reg. 27,139 (May 16, 2005) (stating that the proposed definition was designed to "allow for an unambiguous determination of which isomers of Schedule I hallucinogenic substances are considered to be 'positional'").

(proposed rulemaking) ("This definition will only pertain to those substances that are 'positional isomers' of Schedule I controlled substances pursuant to 21 U.S.C. [§] 812(c)(I)(c) and 21 [C.F.R. §] 1308.11(d)."). In any event, "[w]hen there is a conflict between a general and a specific act on the same subject, the latter shall prevail." Kingsley v. Wes Outdoor Advert. Co., 55 N.J. 336, 339 (1970). Likewise, the specific limitation on the definition's reach prevails over the general title of the rulemaking.

The State also contends that the DEA did not apply its "positional isomer" definition to temporarily designated substances because, when the DEA adopted the definition, "the only prohibited positional isomers were those permanently listed as Schedule I hallucinogens." That may explain the DEA's omission in 2007, when it adopted the definition. But it does not explain its continued omission when, in 2014, it temporarily designated butylone and could have incorporated the "positional isomer" definition.

We also are unconvinced that, notwithstanding the explicit limitation in its regulation, we should defer to the DEA's contrary interpretation that characterized ethylone as a positional isomer of temporarily scheduled butylone. The court in Phifer noted that the DEA in 2015 had listed ethylone as a controlled substance on its website, noting it was a positional isomer of

butylone. 909 F.3d at 383. The court held that the usual deference afforded an agency's interpretation of its own regulation was inappropriate in a criminal case. Id. at 383-85. Instead, the court "must look solely to the language of the regulatory provision at issue to determine whether it unambiguously prohibits the act charged." Id. at 385. We agree.

But even if "positional isomer" as used in the temporary designation of butylone, Schedules of Controlled Substances: Temporary Placement of 10 Synthetic Cathinones Into Schedule I, 79 Fed. Reg. at 12,942-43, were unambiguous and clear so as not to deny fair notice to Green, his conviction must be reversed because the court improperly directed the jury to find that ethylone was a CDS. That was a jury question. The DEA temporarily controlled, and the State similarly controlled, not ethylone, but "[b]utylone, its optical, positional, and geometric isomers, salts and salts of isomers." Ibid. As the federal court concluded, "It is for the jury to decide whether, as a matter of fact, ethylone satisfies all of the generally accepted definitions of a 'positional isomer' of butylone, on which the district court instructs it." Phifer, 909 F.3d at 386;[7] see also United States v. Ross, 719 F.2d 615, 617-18 (2d Cir. 1983)

_____

[7] However, we part company with the Phifer court's determination that the jury was also properly assigned the task to determine what was the generally

(holding that the government bore the burden at trial to prove that a synthetic compound was chemically equivalent or identical to the form of cocaine derivative of coca leaves, where the statute then defined the CDS as coca leaves, their derivatives, and any chemically equivalent compound or preparation).[8]

Likewise, Green's plea to the possession-with-intent-to-distribute count lacked a sufficient factual basis, because Green did not admit that ethylone was a positional isomer of butylone. That was an essential element of the offense. See State v. Campfield, 213 N.J. 218, 236 (2013) (stating "it is essential to elicit

---

accepted definition of "positional isomer" in the scientific community. 909 F.3d at 386. The meaning of a statute or regulation is a legal issue for the court, see Cnty of Bergen Emp. Benefit Plan v. Horizon Blue Cross Blue Shield of N.J., 412 N.J. Super. 126, 131 (App. Div. 2010), not a jury. If the meaning of "positional isomer" were subject to multiple meanings, then the statute failed to provide fair notice. That is why we find more persuasive the view of the concurring judge that "when the undefined term of art does not have a settled meaning," one cannot presume that "Congress intended it to have its established meaning." Phifer, 909 F.3d at 387 (Jordan, J., concurring) (quoting McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 342 (1991)). Instead, "[i]f there are a handful of generally accepted definitions of 'positional isomer' in the scientific community, there might be an as-applied vagueness problem" because "it would be difficult to see how a reasonable person could have known in 2015 whether ethylone was a 'positional isomer' of butylone." Id. at 388.

[8] We recognize the remedy for the erroneous jury instruction would be a new trial. But the vagueness problem is irremediable. That is why we order outright reversal of the ethylone-related counts.

from the defendant a comprehensive factual basis, addressing each element of a given offense").

Therefore, Green's convictions for possessing ethylone, and possessing ethylone with the intent to distribute it, are reversed.

IV.

Because we conclude that the ethylone-related convictions cannot stand, we need not address in detail Green's argument that he is entitled to a new trial based on the opinion testimony of Leon and Bennett. To the extent the witnesses inappropriately offered testimony regarding the intent to distribute, the error was harmless as to the possession-with-intent-to-distribute count, because the jury failed to reach a verdict. And the opinions had no discernable impact on the jury's verdict that Green possessed the alprazolam.

V.

Defendant raises two points that he contends warrant a new trial on the certain persons counts. He argues the court failed to determine that he voluntarily and knowingly stipulated that he committed a predicate offense; and the trial court failed to orally deliver essential parts of the final jury instruction. We agree as to the first point; therefore, we need not reach the second.

30

A.

At the outset of the bifurcated trial of the certain persons charges, the prosecutor offered a stipulation, without objection from defense counsel, that "defendant ha[d] previously been convicted of a crime named in the statute, [N.J.S.A.] 2C:39-7(b)(1), certain persons not to have weapons." The judge then confirmed in a sidebar, again without objection from defense counsel, that he should read the stipulation to the jury, which he then did. But the judge did not question defendant to ascertain if he voluntarily and knowingly agreed to the stipulation, let alone make a finding in that regard.[9]

On appeal, defendant contends the judge's failure to find, after questioning, that defendant knowingly and voluntarily entered the stipulation, was error requiring a new trial. We agree.

There are three elements of the certain persons offense: a person must purchase, own, possess, or control a firearm; a person must do so knowingly; and the person must have been convicted of one of several enumerated predicate offenses. N.J.S.A. 2C:39-7(b)(1) (including possession and predicate offense

---

[9] In his final instruction to the jury, the judge explained that the jury should treat the stipulated fact as undisputed, meaning the parties agreed it was true. But "[a]s with all evidence, undisputed facts can be accepted or rejected by the jury in reaching a verdict." Model Jury Charges (Criminal), "Stipulations" (approved Feb. 14, 2005).

31

elements); N.J.S.A. 2C:2-2(c)(3) (absent a clear legislative intent to create a strict liability crime, applying a knowing state of mind to a crime if the statute omits a culpability requirement). To shield a defendant from the prejudice caused by disclosing "the name and nature" of the predicate offense, a defendant may choose to stipulate that he or she was convicted of a crime that the statute identifies. State v. Bailey, 231 N.J. 474, 488 (2018). "Provided that the stipulation is a knowing and voluntary waiver of rights, placed on the record in defendant's presence, the prosecution is limited to announcing to the jury that the defendant has committed an offense that satisfies the statutory predicate-offense element." Ibid. (emphasis added).[10]

Our Evidence Rules provide that facts may be established by stipulation. N.J.R.E. 101(a)(5). Procedurally, a "court may accept a written stipulation of facts . . . that the defendant admits to be true, provided the stipulation is signed by the defendant, defense counsel and the prosecutor." R. 3:9-2.[11] If a

---

[10] Thus, the right to stipulate to an element of the certain persons offense overrides "the general principle that 'the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away.'" Bailey, 231 N.J. at 485 (quoting Old Chief v. United States, 519 U.S. 172, 189 (1997)).

[11] We cannot confirm if the stipulation complied with the Rule because it was not included in the record. The State explained in its brief that it had been unable to locate it.

defendant's stipulations constitute, "effectively," a guilty plea, then the trial court must inquire of the defendant as it would if taking a guilty plea. State ex rel. T.M., 166 N.J. 319, 335-37 (2001). That is, the court must assure "that there is a factual basis for the plea and that the plea is made voluntarily, not as a result of any threats or of any promises or inducements not disclosed on the record, and with an understanding of the nature of the charge and the consequences of the plea." R. 3:9-2; see also T.M., 166 N.J. at 335-36. When the court fails to do so, the conviction must be set aside. See T.M., 166 N.J. at 337 (reversing denial of motion to set aside plea in juvenile delinquency case). For purposes of our discussion, we may assume that if a defendant's stipulation does not amount to a guilty plea – for example, if a defendant stipulates only to some elements of an offense, leaving others for trial – then the court need not question the defendant as broadly as it would if taking a guilty plea.

Nonetheless, some inquiry is required. The Supreme Court has directed that a defendant charged with a certain persons offense who stipulates to a predicate offense must do so knowingly and voluntarily. Bailey, 231 N.J. at 488. As we have stated in other contexts, "a stipulation must be definite and certain in its terms[,] and the consent of the parties to be bound by it must be clearly established." N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super.

245, 265 (App. Div. 2002); see also Schere v. Twp. of Freehold, 150 N.J. Super. 404, 407 (App. Div. 1977). Also, "[t]his determination must be made by the judge on the record before a party can be deemed bound by the stipulation." J.Y., 352 N.J. Super. at 266; see also Schere, 150 N.J. Super. at 407-08.

Here, the court failed to determine, on the record, that defendant understood the stipulation, and that he voluntarily agreed to it. Consistent with J.Y., we shall not infer, as the State proposes, that defendant knowingly and voluntarily consented to the stipulation simply because he did not object on the record.

We also reject the State's argument that defendant — as opposed to his attorney — invited the court's error by remaining silent. There are four flaws with the State's argument.

First, the State presumes the defendant acted voluntarily and knowingly when he failed to object; but whether defendant acted voluntarily and knowingly is in issue.

Second, neither defendant nor his trial counsel urged, induced, or invited the court to dispense with determining if defendant's stipulation was voluntary and knowing. See Brett v. Great Am. Recreation, Inc., 144 N.J. 479, 503 (1996) (stating the invited error doctrine bars a litigant from arguing an error on appeal

"when that party urged the lower court to adopt the proposition now alleged to be error"). The subject never came up.

Third, defendant's silence falls short of "the sort of gamesmanship-driven scenario to which the invited error doctrine is traditionally applied." Bailey, 231 N.J. at 490 (declining to apply the invited error doctrine to bar an argument that the State failed to prove the predicate-offense element of the certain persons offense).

Fourth and finally, applying the invited error doctrine here would undermine public policy. The same "policy considerations which dictate that no man [or woman] be deprived of his [or her] life or liberty except upon conviction after a fair trial or after the entry of a plea of guilty . . . under circumstances which evidence that it was made truthfully, voluntarily and understandingly," State v. Deutsch, 34 N.J. 190, 198 (1961), require that no stipulation admitting an element of an offense should be accepted unless made knowingly and voluntarily.

We need not view the court's oversight as a structural error, as defendant suggests, in order to conclude that reversal is warranted. Absent a determination that defendant voluntarily and knowingly agreed to the stipulation, the court erred in admitting the stipulation into evidence. But the stipulation was the only

35

evidence presented to the jury on the predicate-offense element of the certain persons offense. Therefore, the court's error was harmful and warrants reversal of the certain persons conviction and a new trial.[12]

B.

With the consent of the prosecutor and defense counsel, the trial judge omitted from his final charge to the jury in the certain persons trial the model instructions on the presumption of innocence, the burden of proof, reasonable doubt, the function of the court, the function of the jury, the requirement of a unanimous verdict, and the credibility of witnesses. Instead, to save time, the court simply headlined those topics, provided the jury with written instructions, and referred the jury to the instructions on those topics given the day before, at the close of the bifurcated trial on the drug-related offenses. Defendant now claims the court's omissions constitute plain error.

---

[12] Because it was a trial error to admit the stipulation without first finding it was voluntary and knowing, we reject the State's contention that Green must await a post-conviction relief (PCR) petition to address the issue. Indeed, because the issue is appropriate for review on direct appeal, it is inappropriate for review on a PCR petition. See R. 3:22-3 (stating a PCR "is not . . . a substitute for appeal from conviction"); R. 3:22-4(a) (stating "[a]ny ground for relief not raised in the proceedings resulting in the conviction . . . is barred from assertion in a [PCR] proceeding").

No doubt, reciting the instructions would have been preferable, in keeping with the notion that the certain persons trial is a new trial. See State v. Ragland, 105 N.J. 189, 195 (1986) (stating that the bifurcated certain persons trial is considered a "'new' trial" and jurors must consider the evidence anew). But because we reverse defendant's certain persons conviction based on the admission of the stipulation, we need not determine whether truncating the final jury charge constituted plain error.

## VI.

In sum, we affirm the conviction of the alprazolam count; reverse defendant's convictions on the ethylone-related counts and the certain persons offenses; and remand for a new trial on the certain persons offenses.

Affirmed in part; reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3676-17